492 A.2d 1336

Norbert T. UNGAR

v.

STATE of Maryland, et al.

No. 829, Sept. Term, 1984.

Court of Special Appeals of Maryland.

June 5, 1985.

474

Paul M. Weiss, Baltimore, for appellant.

Marc K. Cohen, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on brief), for appellee, State of Md., Dept. of Health and Mental Hygiene.

Michael J. McMahon, Asst. County Atty. (Malcolm F. Spicer, Jr., County Atty., Towson, on brief), for appellee, Baltimore County.

Argued before GILBERT, C.J., and WILNER and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

This case requires us to review the rulings of the lower court sustaining all motions raising preliminary objection and a demurrer to appellant's claim and dismissing that claim without leave to amend. We will affirm.

On January 24, 1984, Norbert Ungar, appellant, filed a Claim and Prayer for Jury Trial, (claim) in the Circuit Court for Baltimore County, naming the State of Maryland, Baltimore County, and several individuals, appellees, as defendants.

The claim alleged that in May, 1973, Ungar purchased 5.6 acres of commercially zoned undeveloped land in the Gwynns Falls Basin, for use as an automobile dealership. He obtained the necessary permits, including grading, plumbing and building permits, to proceed with his development plan. Grading and clearing began in July, 1973. Construction started toward the end of August, 1973. On May 14, 1974, by which time Ungar had invested approxi-

mately eighty percent of the construction costs, the State Department of Health and Mental Hygiene imposed a sewer moratorium on the Gwynns Falls Basin, prohibiting further connection to the Gwynns Falls sewer main. Pursuant to Ungar's request for an immediate hearing, a hearing was held in September, 1974, and in November, 1974, the moratorium was lifted as to Ungar's property. Ungar contends that the almost seven month delay caused him to incur many increased and added construction costs.[1] The Ungar Olds, Inc. dealership opened in 1975. The dealership suffered severe financial losses during 1975 to 1977 and in January, 1977, Maryland National Bank instituted foreclosure proceedings against it. On June 16, 1977, the assets of Ungar Olds, and the real estate, owned by Ungar, individually, and leased to the corporation, were sold at foreclosure sale.

Ungar alleges that he subsequently became aware that during 1980, two governmental officials, Alan Spector, then a member of the City Council of Baltimore and one "Wyman", by whom we assume is meant Maurice Wyatt,[2] then an aide on the Governor's staff, "were tried for various charges, including bribery and other fraudulent and criminal acts involving the use of their influence over various public officials including certain Maryland State department [sic] of Health employees and officials, and obtaining favored treatment with regard to the lifting of the sewer moratorium and obtaining speedy sewer hook-up, on behalf of certain developers who paid the aforesaid bribes to them.... This favorable treatment for some developers

---

1. Ungar maintains that due to the moratorium, construction came to a standstill and most of the subcontractors were lost. Interest continued to accrue on the mortgage and inflation caused costs to increase drastically. Ungar further maintains that the Ungar Olds, Inc. opened almost one full year behind schedule and, due to a severe lack of capital and extensive and oppressive debts, all caused by the sewer moratorium, the dealership could not operate efficiently and suffered severe financial losses during the period of its operation.

2. Ungar refers to "Wyman", throughout the claim.

caused a disfavorable treatment of other affected developers such as [Ungar]" and that on January 22, 1981, the appellate court "confirmed the findings of the lower court."

Relief was sought on six bases. In the First Count, Ungar alleged that appellees, by virtue of the procedure for issuing permits, "falsely led" Ungar to believe that once permits were obtained, construction could proceed without interruption; that the sewer moratorium was not only unwarranted but was tainted by deceit and injustice; and that, because of the illegal activities of Spector and Wyatt, Ungar was "unjustly discriminated against." The Second Count alleged that appellees did not follow appropriate standards and procedures in issuing permits and in imposing the moratorium. The Third Count alleged that appellees negligently entrusted the administration of the moratorium to "individuals not qualified or capable of properly carrying out the duties of [their] job or office." In the Fourth Count, "[b]ased on the fraud and proven illegal acts of defendants Spector, [Wyatt] and Norin[3] [sic]", the Assistant Attorney General assigned to represent the State Department of Health and Mental Hygiene, appellees were charged with "an abuse of police powers to have arbitrarily imposed the sewer moratorium", which was accentuated by the complete mishandling of the moratorium. The Fifth Count alleged a breach by appellees of an implied contract not to interfere with the use of building or plumbing permits once issued. Finally, the Sixth Count, charged that the actions of the appellees in connection with the sewer moratorium constituted a taking of his property without just compensation in violation of the Fifth Amendment to the United States Constitution. The claim thus sounded both in tort and contract, although the only relief sought was money damages.

The State filed a Motion Raising Preliminary Objection on the grounds of sovereign immunity and lack of standing

---

3. The correct spelling is "Noren".

and a Special Plea of Limitations. Baltimore County filed similar motions as well as a Demurrer, alleging that the claim failed to state a cause of action, was barred by limitations, and was precluded by then Md.Code Ann. Article 57, § 18[4] because of Ungar's failure to give proper notice of claim to the County. Hearing was held on the pleadings on July 2, 1984. The trial judge sustained the motions raising preliminary objection and the demurrer, without leave to amend. It is from that Judgment that Ungar appeals.

## I.

Ungar first argues that the trial judge erred in ruling on appellee Baltimore County's demurrer because demurrers had been abolished, effective July 1, 1984. Relying on Md.Rule 2–302,[5] Ungar reasons that since demurrers no longer existed as a valid pleading when the ruling was made, the trial court could not legally rule on the County's demurrer.

■ While Ungar correctly notes that the trial judge ruled on the County's demurrer on July 2, 1984 and that the new Rules took effect on July 1, 1984, he fails to consider the Rules Order, dated April 6, 1984, of the Court of Appeals, which provides that the Rules:

Shall govern the courts of this State and all parties and their attorneys in all actions and proceedings; and shall take effect and apply to all actions commenced on and after July 1, 1984, and insofar as practicable, to all actions then pending.

It would be the height of folly to adopt Ungar's construction and proposed application of the new Rules. His posi-

---

4. Presently codified in Md.Code Ann. Courts Article, § 5–306, pursuant to 1978 Md.Laws, Ch. 770.

5. Md.Rule 2–302, captioned "Pleadings Allowed", provides that "Demurrers, Pleas and Replications are abolished." The Rule became effective July 1, 1984. The demurrer was replaced by a motion to dismiss. See Md.Rule 2–322(b).

tion flies in the face of their purpose, see Md.Rule 1–201, and is totally devoid of merit. The trial court properly ruled on the County's demurrer, which was pending prior to the effective date of the new Rules.[6]

## II.

Asserting that a demurrer is not the appropriate pleading to determine whether a "taking" has occurred and that his claim states a claim upon which relief can be granted, Ungar next contends that the trial judge erred in granting the demurrer. Again, we disagree.

At the threshold, we acknowledge that Ungar has cited the appropriate test to be used to review the propriety of the grant or denial of a demurrer; well pleaded allegations of fact contained in the complaint are taken as true and the complaint should not be dismissed unless it appears that no set of facts can be proven in support of the claim set forth therein. *Nistico v. Mosler Safe Co.*, 43 Md.App. 361, 405 A.2d 340 (1979). *Baltimore Import Car Service & Storage, Inc. v. Maryland Port Auth.*, 258 Md. 335, 265 A.2d 866 (1970). Nevertheless, we conclude that, under the rules applicable to this case, a demurrer was the appropriate vehicle by which to test the material allegations of the complaint for sufficiency to state a claim upon which relief can be granted.

In Count Four of his claim, Ungar alleges an abuse of police power, specifically,

> That in fact the Department of Health of the State of Maryland gave approval for issuance of these building and plumbing permits herein by Baltimore County only after the aforesaid evaluation was completed. At the time these permits were issued the anticipated trend of

---

**6.** It would make little practical difference whether the former rule or the new rules were applied. The function of the motion to dismiss is equivalent to that performed by the new defunct demurrer. Thus, the result in this case would not have been affected no matter which rules were applied.

sewage flow increase and the capacity of the sewage facilities were well known to defendants. The calculations of anticipated sewage flow had already been made and the approval of the issuance of the aforesaid construction permits had already contemplated the capacity of the sewage system versus the requirements of this project. In view of the facts in this case there was an abuse of police powers to have arbitrarily imposed the sewer moratorium on this Ungar Olds development. This abuse was further accentuated by the complete mishandling of the sewer moratorium as aforesaid. Based on the fraud and proven illegal acts of defendants, Spector, Wyman and Norin the imposing of the sewer moratorium was an illegal abuse of police powers and part of a scheme to illegally extract funds from developers. This scheme was tantamount to an extortion effort through the abuse of police powers. The result, however, was to cause grave monetary losses to the plaintiffs.

█ Count Six sounds in "inverse condemnation".[7] The specific allegations are:

Plaintiffs further allege that the actions of the defendants Baltimore County, the Maryland State Health Department, their employees, department heads, and officials involved with the aforesaid sewer moratorium were tantamount to a taking of property without providing fair compensation therefore. This is in violation of the fifth amendment of the United States Constitution.

Essentially, then Ungar contends that the imposition of the moratorium was an unreasonable exercise of police power and that the delay occasioned by the moratorium on Un-

---

7. In *Agins v. City of Tiburon,* 447 U.S. 255, 258 at n. 2, 100 S.Ct. 2138, 2140 at n. 2, 65 L.Ed.2d 106 (1980), the Supreme Court defined inverse condemnation as "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted". (Citing *U.S. v. Clark,* 445 U.S. 253, 255–258, 100 S.Ct. 1127, 1129–1130, 63 L.Ed.2d 373 (1980)). See also the dissenting opinion of Mr. Justice Douglass in *San Diego Gas & Electric Co. v. San Diego,* 450 U.S. 621, 638 n. 2, 101 S.Ct. 1287, 1297 n. 2, 67 L.Ed.2d 551 (1981).

gar's property was such as to amount to an unconstitutional taking. In essence, he argues that any governmental action that effectively prohibits the owner from using his property constitutes a taking and, if no compensation is paid, the action is violative of both provisions of the Fifth Amendment to the United States Constitution, Article 3, § 40 of the Maryland Constitution, and Article 24 of the Maryland Declaration of Rights.[8] A claim of this kind usually arises in the context of an exercise of the police power, which, as an incidental effect, limits the use of property, rather than from an affirmative exercise of the power of eminent domain. The issue then is whether the sewer moratorium, an exercise of the police power, was so unreasonable as to constitute a deprivation of property without due process of law and/or whether the delay occasioned by its imposition was such as to constitute a taking of private property without just compensation.

■ "A regulation which prohibits a beneficial use of private property constitutes a fair exercise of the police power if the public interest generally requires it and the regulation is reasonably necessary to achieve the public

---

**8.** The Fifth Amendment to the United States Constitution provides in pertinent part:

No person shall ... be deprived of ... property without due process of law; nor shall private property be taken for public use, without just compensation.

There is a theoretical distinction between deprivation of property without due process of law and taking of property for public use without just compensation. The former involves regulation pursuant to the police power and the latter, eminent domain. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Md.—Nat'l Cap. P. & P. Comm'n v. Chadwick,* 286 Md. 1, 405 A.2d 241 (1979); *Smoke Rise, Inc. v. Washington Suburban San. Com'n,* 400 F.Supp. 1369 (D.Md.1975).

Article 3, § 40 of the Maryland Constitution provides:

The general assembly shall enact no law authorizing private property, to be taken for public use, without just compensation ...

Article 24 of the Maryland Declaration of Rights provides, in pertinent part:

That no man ought to be ... disseized of his freehold ... or deprived of his ... property, but by the judgment of his peers, or by the law of the land.

goal without being unduly oppressive upon individuals."
*Md.-Nat'l Cap. P. & P. Comm'n v. Chadwick, supra* [286
Md.] at page 9, 405 A.2d 241, *Edgewood Nursing Home v.
Maxwell,* 282 Md. 422, 384 A.2d 748 (1978), *Smoke Rise,
Inc. v. Washington Suburban San. Com'n, supra.* If the
exercise of the police power is fair, compensation for dimi-
nution in value caused by the regulation is not required,
*Penn Central Transportation Co. v. New York,* 438 U.S.
104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), even if the
property is destroyed. *Bureau of Mines v. George's Creek,*
272 Md. 143, 321 A.2d 748 (1974).

■ Ungar does not suggest that the imposition of the
sewer moratorium was for reasons other than "because the
sewage system and facilities might not be able to handle
increased sewage", rather, he asserts that the issuance of
construction permits, in view of the already contemplated
capacity of the sewage system and the mishandling of the
moratorium, coupled with the illegal acts of certain defend-
ants,[9] rendered the sewer moratorium an illegal abuse of
police powers. Ungar, likewise, does not allege that he was
not permitted to continue construction, to install a septic
tank on the property, or to use the property for any other
purpose. His allegations *do* indicate that the moratorium
lasted, insofar as his property is concerned, for a total of
about seven months. Taking these material allegations as
true, Ungar has not alleged a cause of action for depriva-
tion of property without due process of law. *Smoke Rise,
Inc. v. Washington Suburban San. Com'n, supra.*

■ In assessing whether a taking of private property for
public use without just compensation or due process of law
has occurred, one must be mindful that "the difference
between the exercise of the police power and the power of
eminent domain is a matter of the degree of damage to the
property owner." *Smoke Rise, Inc. v. Washington Subur-*

---

9. Despite these allegations, there is nothing in the record to implicate
the State or the County in any conspiracy. *P.G. County v. Blumberg,*
288 Md. 275, 418 A.2d 1155 (1980).

*ban San. Com'n, supra* at 1382. We have already seen from Ungar's allegations that the sewer moratorium was imposed solely to prevent a public harm, and that it affected Ungar's property for a period of less than seven months, a period not unduly lengthy or burdensome. We conclude, therefore, that its imposition and its duration constituted neither a taking of private property without just compensation nor a deprivation of Ungar's property without due process of law. *Smoke Rise, Inc. v. Washington Suburban San. Com'n, supra, Ocean Acres Limited v. Dare County Bd. of Health,* 707 F.2d 103 (4th Cir.1983).

■ The result would be the same even if the test related only to the extent to which the use of Ungar's property was restricted. There is no allegation that Ungar was denied all, or essentially all, beneficial use of his property. The absence of such an allegation negates the inference that his property was taken. *Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 414 A.2d 1246 (1980). *See also 1902 Atlantic Ltd. v. Hudson,* 574 F.Supp. 1381 (E.D.Va.1983) (a taking occurs when a landowner is denied all viable economic use of his property); *Steel Hill Development Co., Inc. v. Town of Sanbornton,* 469 F.2d 956 (1st Cir.1972) (no taking occurs unless property has been rendered worthless or useless). We perceive no error.

### III.

We proceed to a consideration of the remaining counts of Ungar's claim. The trial judge found these counts to be barred by limitations. We agree.

■ The sewer moratorium was imposed on May 14, 1974. Suit was not filed until January 24, 1984. Md.Code Ann., Courts Article § 5–101 provides:

A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

Ungar alleges that his cause of action did not accrue until the wrongs alleged were discovered or, through the exercise of due diligence, should have been discovered. *Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981). Pointing out that his claim alleges fraudulent and deceitful activity on the part of the State and its employees, he alleges that the statute did not begin to run until February, 1981 when he first "discovered" the facts which form the basis for his action. First, it is undisputed that Ungar was aware of the moratorium when it was imposed: immediately upon learning of the moratorium, he sought and received a hearing concerning its continuation as to his property and he was successful in having it lifted. It is obvious, therefore, that Ungar did not just discover in 1981 the alleged injury to his property caused by the moratorium, rather he was, or should have been, aware of it when, or shortly after, the moratorium was imposed. *Ocean Acres Limited v. Dare County Bd. of Health, supra.*[10] Secondly, Ungar neglects to place sufficient emphasis on that part of the test which requires that limitations begin to run when the facts should have been discovered. The claim recites that Spector and Wyatt were charged, in 1980 with various crimes arising out of the sewer moratorium and that the findings of guilt as to these charges were affirmed, on appeal, on January 22, 1981. When Ungar learned of these facts, whether before or after January 22, 1981, is not alleged.[11] Taking the latest date alleged, as the date by which Ungar was aware of the activities of Spector, Wyatt and Noren, we find that limitations should have run on January 22, 1984. January 22, 1984 was a Sunday, therefore, limitations would have run on January 23, 1984. This action was

---

10. Ungar has correctly observed that, in Ocean Acres, limitations were applied to bar only the plaintiff's due process claim. It should be noted, however, that the court did conclude that allegations of fraud could not insulate the plaintiff's inverse condemnation claim from a determination that no taking was shown.

11. Ungar's brief alleges that Ungar was not aware of the facts which formed the basis of his action until late February, 1981.

not filed until January 24, 1984. Thus, considering the allegations of the claim in the light most favorable to Ungar, the cause is barred by limitations. In any case, it is clear from the allegations of the claim that, with due diligence, Ungar should have discovered the facts which form the basis of his action much earlier than February, 1981.[12]

Given our view of the issues here discussed, it is unnecessary that we consider the other contentions raised.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

---

12. We are of the view that Count Six of the claim is likewise time barred. When suit was filed, Ungar no longer retained an interest in the property and the restriction on the property had long since been lifted. Although couched in terms of inverse condemnation, when reduced to its simplest form, Count Six is no more than a claim for damages. Given the purpose of the statute of limitations, *Walko Corp. v. Burger Chef*, 281 Md. 207, 378 A.2d 1100 (1977), *Decker v. Fink*, 47 Md.App. 202, 422 A.2d 389, cert. denied, 289 Md. 735 (1981), we perceive no reason to treat this action differently than other actions, not couched in constitutional terms, for damages.

Count Four similarly is time barred. *Ocean Acres Limited, supra.*