676 A.2d 978

**Gina RAYNOR, a Minor, etc., et al.**

**v.**

**MARYLAND DEPARTMENT OF HEALTH AND MENTAL HYGIENE.**

**No. 1535, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

May 29, 1996.

Paul Victor Jorgensen, Middletown (James Pembrook Scott, Crownsville, on the brief), for Appellants.

Matthew A. Lawrence, Staff Attorney (J. Joseph Curran, Jr., Attorney General, and Helene E. Bowlus, Assistant Attorney General, on the brief), Baltimore, for Appellee.

Before CATHELL, DAVIS and MURPHY, JJ.

DAVIS, Judge.

This is an appeal from the decision of the Circuit Court for Washington County (Moylan, J.) to grant appellee's motion to dismiss appellants' counterclaim against appellee on July 25, 1995. The trial court treated appellee's motion as though it were a motion for summary judgment and considered evidence beyond the four corners of appellants' counterclaim. Appellant presents the following issues for our review:

I. Did the trial court err when it found that Christina Hiett was in jeopardy of contracting rabies, and that the Maryland Department of Health and Mental Hygiene was bound and justified in ordering the ferret's destruction and testing to determine whether she was at such risk?

II. Is the Maryland Department of Health and Mental Hygiene required by the United States Constitution and Maryland's Constitution to pay compensation to the owners of a healthy pet animal for the destruction and testing of their animal pursuant to the Department's rabies eradication program?

III. Did the trial court's denial of Heather Sauders's motion to intervene during the injunction hearing bar her from joining as a counterclaimant in the second amended complaint?

## FACTS

On December 22, 1994, Gina Raynor, a twelve-year-old girl, took her pet ferret to a slumber party hosted by another girl's parents. Thirteen-year-old Christina Hiett attended the sleep-over party. Unknown to her parents, Christina was thinking about adopting the pet ferret and wanted to see what the ferret was like. Toward that end, Gina brought the ferret to the party in a clothes bag and let it wander about in the bedroom while the four girls attending the party sat on the host's bed, ate cookies, and passed the night away. At some point, the ferret went over to a cookie that was lying on the bed next to Christina's hand and started to sniff the cookie.

Apparently, the ferret determined by its smell test that it wanted to eat the cookie and so it decided to take a bite. Unfortunately for all parties involved, however, the ferret missed the cookie and bit Christina's hand between the thumb and forefinger. Christina bled a little, but washed her hand and rejoined the party without telling any adults of the incident.

When Christina went home the next day, she did not immediately tell her parents about the ferret bite. Her mother, Victoria Hiett, learned of the incident only after directly confronting her daughter about the bite mark on her hand. After she learned the nature of the bite, Ms. Hiett contacted her doctor who referred her to the Maryland Department of Health and Mental Hygiene, appellee, and told her to go to a hospital emergency room. An emergency room physician gave Christina a tetanus shot, but did not recommend that Christina be given a rabies vaccination because of the combination of the treatment's side effects and the doctor's lack of knowledge concerning the ferret that bit Christina.

Appellee informed Ms. Hiett that in cases where an animal has bitten a person, there are two choices—(1) the individual may receive the rabies prophylaxis, or (2) the animal can be destroyed and its brain tested to determine if it has rabies and if vaccination is necessary. Before deciding upon her daughter's course of action, Ms. Hiett conducted her own research of rabies and the necessary vaccinations—she consulted the Physicians Desk Reference, called her family doctor, called the hospital, and contacted the maker of the vaccine. Finally, Ms. Hiett decided that, because the animal was not vaccinated against rabies, Christina would have to undergo the rabies treatment if it could not be determined whether the ferret had rabies. Consequently, Ms. Hiett wanted the animal destroyed and its brain tested for rabies before she forced her daughter to undergo what she perceived to be a painful series of injections that could have other harmful side effects.

As a result of Ms. Hiett's decision, appellee ordered Gina's father, Steven Raynor, to give the ferret to the local Society for the Prevention of Cruelty to Animals (SPCA) or to a local veterinarian for destruction and testing.[1] Six days later, appellee sought from the Circuit Court for Washington County an order requiring Mr. Raynor to turn over the ferret for testing because he had not yet done so. Pending the resolution of appellee's petition, Mr. Raynor agreed to give the ferret to the local SPCA for safekeeping.

After hearing testimony presented by both parties on January 20 and 23, 1995, the circuit court granted appellee's petition for an injunction requiring appellants to submit the ferret for rabies testing. The circuit court stated that appellee and the Washington County Health Department (WCHD) were empowered to compel the destruction and testing of the ferret by MD.CODE ANN., HEALTH-GEN. § 18–313 and § 18–320 (1984), as well as COMAR 10.06.02. The court explained that it found that the testimony of several doctors indicated that rabies is a deadly disease and that the only method available to determine if an animal has it is to test the animal's brain after it has been destroyed. It stated that the regulations defined entire species as domesticated or wild and not individual pets. Additionally, the court found that the regulations requiring the testing of a ferret that bites a human were rationally and cogently developed. The circuit court determined that appellee's regulations implementing MD.CODE ANN., HEALTH-GEN. § 18–313, et seq. (1984) were based upon the recommendations of the Immunization Practices Advisory Committee (ACIP) associated with the Division of Viral and Rickettsial Diseases, Center for Infectious Diseases, Center for Disease Control (CDC). The court noted that ACIP's most recent publication regarding rabies states that ferrets are considered wild animals because they may be highly susceptible to rabies and can transmit the disease, particularly

---

1. Both parties agree that the only method available at present to test an animal for rabies is to test its brain tissue. This cannot be accomplished without destroying the animal.

as the shedding period (the time during which rabies lives in an animal's saliva) is unknown in ferrets. The court further found that appellee's expert who testified at the hearing discounted several studies relied upon by appellants to demonstrate that biting ferrets should not be destroyed. The court noted that appellant's expert was only qualified as an expert on pediatrics and subsequently held that appellee's expert testimony established that ferrets are wild animals and that the ferret in this case needed to be tested for rabies in order to ensure Christina's continued health.

As a result, the circuit court ordered that the animal be tested. Additionally, the trial court granted appellant Gina Raynor permission to intervene in the action and allowed appellants to submit a counterclaim against appellee. The circuit court, however, denied Heather Sauders's attempt to intervene and become a party to the counterclaim. Heather, a friend of Gina's, claimed to be a part owner of the ferret. When the ferret was born, Gina and Heather shared ownership of her. Each took care of the ferret for periods of up to two months at different times during which the ferret never lived outside and had no exposure to wild animals.

Appellants filed a three-part counterclaim alleging (1) inverse condemnation, (2) damages that were compensable under the Maryland Constitution and Declaration of Rights, and (3) conversion under the Maryland Tort Claims Act. The complaint disputed the necessity of destroying all ferrets that have bitten humans and stated that appellee's decision to test the ferret in this case was unnecessary. As a result, appellants claim that they are entitled to compensation for the destruction of their property—the ferret.

Appellee filed a motion to dismiss appellants' claim alleging that no compensation was owed. The trial court treated this motion as if it were a motion for summary judgment and considered much of the evidence presented to the circuit court during the injunction hearing. The trial court found that appellee was justified in its decision to destroy and test the ferret because Christina was in danger of contracting rabies.

The court held that appellee was acting within the legitimate boundaries of its police power when it did so. The trial court also dismissed the unlawful conversion count because it held that there was no unlawful taking. Finally, the trial court stated that the circuit court had already denied Heather's motion to intervene and so it would not consider the petition.

## I

Appellants contend that summary judgment is inappropriate in the case *sub judice*. Appellants do not question the trial court's decision to treat appellee's motion to dismiss as a motion for summary judgment. Rather, appellants argue that the evidence before the trial court demonstrated that the rabies test was not necessary because Christina's health was never in jeopardy and because the ferret did not have rabies. Appellants argue that these two facts make appellee's decision to seize and destroy the animal an improper use of the State's police power. Appellants apparently concede that appellee could take the ferret from appellants for testing so long as the taking was justified as a legitimate exercise of the police power, *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), and that appellee legitimately acted pursuant to the State's police power if destroying and testing the ferret was substantially related to the protection of Christina's health. *Cf. Potomac Sand & Gravel v. Governor*, 266 Md. 358, 293 A.2d 241, *cert. denied*, 409 U.S. 1040, 93 S.Ct. 525, 34 L.Ed.2d 490 (1972).

Appellants claim that, contrary to the trial court's finding, Christina was never in jeopardy of contracting rabies, as shown by the negative test result. Appellants assert that the evidence adduced at the injunction hearing and considered by the trial court on summary judgment indicated that Christina was not at risk to contract rabies from the ferret's bite because of the animal's history, species and circumstances of the bite. In other words, appellants argue that appellee's decision to test the ferret was not warranted by the facts and that this was demonstrated to the trial court. If this is so, according to appellants, appellee's actions were not justified

by the State's police powers because they were not substantially related to the protection of Christina's health.

As we consider this case, we are, of course, mindful that we are reviewing the trial court's decision to grant summary judgment and that, as a result, we must determine whether the trial court was legally correct. The rationale is that

> [w]hen making a determination on summary judgment, a trial court makes no findings of fact. Rather, the court decides whether a genuine issue of material fact exists to prevent the entry of summary judgment. Under this standard, therefore, we review the trial court's ruling as a matter of law.

*IA Constr. Corp. v. Carney,* 104 Md.App. 378, 384, 656 A.2d 369 (1995), *aff'd,* 341 Md. 703, 672 A.2d 650 (1996) (citations omitted). *See also Consumers Life Ins. Co. v. Smith,* 86 Md.App. 570, 572–73, 587 A.2d 1119 (1991). Additionally, in determining whether summary judgment is appropriate, a court must view the facts, including all inferences, in the light most favorable to the non-moving party—appellants. *See Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307 (1995).

Appellants direct this Court's attention to the testimony of several witnesses that they claim establish that appellee was not justified when it tested the ferret. Dr. Hoffman, an expert in pediatrics, testified that Christina was not in any danger of contracting rabies. He stated:

> I believe that the circumstances of the bite, uh, the history is, is totally absent of any exposure to rabies. Uh, the fact that the, there is no logical explanation for a, this animal to, to have been exposed. . . . So in this case I would be telling those parents, both the bite parents, the parents of the child who, who was nipped, as well as the parents who currently own the animal, that there is no risk in this situation and that post-exposure prophylaxis would not be warranted and that quarantine of the animal, uh, you know, would be something to, to be considered only if there was nervous-

ness. That is what my assessment is, *that this is a no risk situation.*

(Emphasis added). Additionally, Dr. Badura, a veterinarian who examined the ferret in question after the biting incident, testified that she found the animal to be within the "normal health parameters of a ferret." This diagnosis was based upon her examination of the ferret at which time she looked at the eyes, ears, and throat of the ferret and performed a skulltation of the heart and lungs, palpation of the abdomen, and a rectal temperature reading. At the conclusion of her visit, Dr. Badura found that there was no indication that the ferret had any health problem. Appellants place additional weight on the testimony of both Dr. Grigor and Dr. Hoffman, who stated that epidemiological evidence shows that no human has ever been reported to have contracted rabies from a ferret and that the number of reported rabid ferrets was statistically non-existent.

Appellants also point to two other sources to dispute the trial court's finding that Christina's health was at risk. Appellants state that it was the testimony of those responsible for the care of the ferret that it lived its entire life in a domestic environment—the ferret lived at either Gina Raynor's or Heather Sauders's home since birth. Furthermore, it was their testimony that at no time was the ferret lost or did it come in contact with other wild animals. Finally, appellants direct our attention to the test result to prove their point—the test was negative for rabies. This, appellants assert, is proof positive that Christina was never in danger of contracting rabies.

Appellants further argue that the ferret did not need to be tested because the necessity of the prophylaxis treatment could have been determined without performing a rabies test on the animal's brain. According to appellants' pediatric expert, Dr. Hoffman, whether vaccination against rabies is required after an individual has been bitten is

> based on the clinical evaluation of the circumstances, it is not based on a laboratory examination. The laboratory

examination can, can [sic] bring comfort to a, to a low level, you know, to a medium level, I won't say low level, there's no risk, there's risk or there is extreme risk, uh, and in the, in the suspected cases where, uh, where you think the animal, and it's not flagrant, you know, but I think the bottom line is I would not rely on the test by itself. There are situations where tests will be negative . . . [and] I would not stop post-exposure prophylaxis if, if it had already been started based on that negative test.

Appellants contend that the doctor's testimony supports their argument that testing was unnecessary because the need for post-exposure prophylaxis treatment could have been determined merely by studying the animal that bit Christina, in this case a domesticated ferret.

Finally, appellants assert that appellee's decision to destroy and test the ferret was an act that was outside the State's police power because appellee's own regulatory policy wrongly classified ferrets as wild animals that must be destroyed and tested in the event that they bite a human. MD.CODE ANN., HEALTH-GEN. § 18–313 (1986) authorizes appellee to establish regulations, *inter alia,* to control rabies. COMAR 10.06.02.06(B)(3) was formulated in compliance with § 18–313 and requires any "wild animal" that bites a human to be destroyed and the head to be submitted to appellee's laboratory for rabies testing.[2] MD.CODE ANN., HEALTH-GEN. § 18–320(d)(1) also authorizes the destruction and testing of a biting animal if it is necessary to preserve human health.[3] Appellee

---

2. COMAR 10.06.02.06:

 B. Quarantine of Biting Animals

 (3) Wild Animals. Any wild animal that bites or otherwise exposes to rabies a human shall be immediately destroyed and its head submitted to the State Department of Health and Mental Hygiene Central Laboratory for rabies testing. Exceptions to this requirement may be granted by the public health veterinarian.

3. MD.CODE ANN., HEALTH-GEN. § 18–320(d)(1) states:

 The public health veterinarian or local health officer may order the immediate and humane destruction of a biting animal for rabies testing if: it is necessary to preserve human health.

classifies ferrets as wild animals that are subject to the above regulations. Appellants, however, argue that the trial court had evidence before it that dogs, cats, and livestock, all of which they claim are more prone to expose an individual to rabies than ferrets, are not required to be destroyed. Because ferrets are less likely to infect a human, appellants claim that appellee's classification of ferrets as wild animals is wrong and that ferrets should be treated as domesticated animals that are only quarantined in the event that they bite a human. Additionally, appellants argue that the regulatory scheme allowed appellee merely to quarantine the ferret and compel the bite victim to receive post-exposure treatment.

Each argument put forward by appellants to challenge appellee's decision to destroy the ferret denies that appellee's actions were within the police power that the State and its agencies may lawfully exercise. In this case, appellants attack the validity of a statute, MD.CODE ANN., HEALTH-GEN. § 18–320(d)(1) (1984), and a regulation, COMAR 10.06.02.06(B)(3), which itself was created to satisfy a statutory mandate set forth in MD.CODE ANN., HEALTH-GEN. § 18–313 (1986). We must, therefore, determine whether those laws are lawful manifestations of the State's police power. "A legislative enactment is within the permissible bounds of the police power if it is reasonably and substantially related to the public health, ... safety and welfare of the people." *Cade v. Montgomery County*, 83 Md.App. 419, 425, 575 A.2d 744, U.S. *cert. denied*, 498 U.S. 1085, 111 S.Ct. 960, 112 L.Ed.2d 1047 (1991). *Cf. The Maryland–Nat'l Capital Park And Planning Comm. v. Chadwick*, 286 Md. 1, 8–9, 405 A.2d 241 (1979); *Edgewood Nursing Home v. Maxwell*, 282 Md. 422, 426, 384 A.2d 748 (1978). The State's exercise of its police power is reviewable, of course, *Aero Motors, Inc. v. Motor Vehicle Admin.*, 274 Md. 567, 588, 337 A.2d 685 (1975), "but the exercise of such power will not be interfered with unless it is shown to be misused or abused, or where it is shown to be exercised arbitrarily, oppressively or unreasonably." *Id.* (citations omitted). Moreover,

The *wisdom* or *expediency* of a law adopted in the exercise of the police power of the state *is not subject to judicial review* and such a statute will not be held void if there are *any considerations* relating to the public welfare by which it can be supported.

*Id.* at 588–89, 337 A.2d 685 (emphasis added) (citations omitted). The decidedly difficult task of demonstrating the invalidity of a legislative enactment predicated upon the police power is made even more onerous by the fact that "the burden of demonstrating the invalidity of a legislative enactment rests [entirely] with the party attacking its constitutionality." *Cade,* 83 Md.App. at 425–26, 575 A.2d 744.

Initially, we note that appellants sought to place before the trial court and this Court the wrong issue. Of the five objections appellants articulate to the handling of the ferret in this case, two are based on the assertion that Christina's health in this case was never at risk and the destruction of the animal was unnecessary because (1) the ferret was domesticated, having been raised and kept in captivity its entire life; and (2) the animal was examined by a veterinarian after the incident and found to be in good health. Appellants seem to suggest that the question is whether appellee had the authority to seize and destroy this ferret. That is not the question. Rather, appellants must challenge the enabling legislation that allows appellee to destroy and test ferrets in general.

They cannot acknowledge the lawfulness of MD.CODE ANN., HEALTH–GEN. § 18–320(d)(1) (1984), and COMAR 10.06.02.06(B)(3) and challenge appellee's specific application to this case of the powers granted therein because these sections directly authorize appellee's conduct in the event any ferret, healthy or otherwise, bites a human. In other words, appellants cannot argue that this individual ferret should not have been destroyed, but rather must argue that appellee's treatment of all ferrets is in some manner objectionable. This principle was recognized by the circuit court during its consideration of the matter during the injunction hearings on January 20 and 23, 1995, when it stated, "[T]he regulations relate to *species* of animals, not particular animals." (Emphasis

added.) Because this is the case, appellants must challenge appellee's authority to destroy and test ferrets.

Among the remaining three arguments that appellee's seizure, destruction, and testing of the ferret was beyond the State's police powers, one questions the wisdom of MD.CODE ANN., HEALTH-GEN. § 18–320(d)(1) (1984), and COMAR 10.06.02.06(B)(3). Appellants assert that destruction of an animal is never necessary as the need for treatment can be determined by the biting animal's history and the possibility that it could have contracted rabies. As noted above, Dr. Hoffman testified that in cases where a human is exposed to rabies, one cannot rely on a rabies test to determine whether treatment is necessary because mistakes may be made by a testing laboratory and there can be false negatives wrongly indicating that the victim of an animal bite did not contract rabies. Instead, Dr. Hoffman testified that the proper course of action for the victim is to determine whether the biting animal is at high risk of having rabies regardless of any rabies test. Appellants assert that the course prescribed for the handling of wild animals is irrational because the test need not be performed in order to evaluate the necessity for the victim to undergo prophylaxis treatments.

As previously noted, when the soundness of a law adopted in accord with the State's police power is questioned, the law will not be held void if there are any considerations relating to the public welfare by which it can be supported. *See Aero Motors, Inc.,* 274 Md. at 588–89, 337 A.2d 685. In the case *sub judice,* appellee's rabies policy is sufficiently related to furthering the public welfare that it is a legitimate exercise of the police power. Preliminarily, we note that Dr. Hoffman's position that testing is not necessary is born out of his belief that a false-*negative* test result may cause an individual to forego post-exposure treatment. Appellee's policy as set forth in COMAR 10.06.02.06(B)(3), as well as MD.CODE ANN., HEALTH-GEN. § 18–320(d)(1) (1984), is designed to help ensure that any bite victim who is bitten by a "wild" animal receives post-exposure prophylaxis treatment in the event of a positive test. If a test is negative, appellee may still counsel in favor

of post-exposure prophylaxis treatments if the biting animal's history indicates the wisdom of such a course of action. The test is merely one more weapon in appellee's arsenal against rabies.

██ Additionally, even where other experts believe alternative solutions to a problem are more appropriate than that proposed by an agency, courts may defer to the agency's own expert opinion of the best method for resolution of the problem. *See Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 371, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973). In this case, therefore, we may also defer to appellee's solution to the rabies problem even if, as appellee asserts, there are legitimate alternatives.

 Appellants also argue that appellee's policy, which classifies ferrets as wild animals for the purpose of administering its regulations, is wrong. As stated above, appellants presented evidence to the trial court that ferrets were not properly classified as "wild" animals and are, in fact, less likely to transmit rabies to humans than other "domesticated" animals such as dogs and cats that are merely quarantined after a biting episode. Appellee's regulations separate animals into two categories: domesticated animals and wild animals. *See* COMAR 10.06.02.02. In the event that an animal bites a human, its treatment is determined by its classification. Domesticated animals are not required to be destroyed and tested, but rather are simply quarantined for a period of time. *See* COMAR 10.06.02.06(B)(1),(2). Wild animals, on the other hand, are to be destroyed and tested unless an exception is granted by the public health veterinarian. *See* COMAR 10.06.02.06(B)(3). Appellee classifies ferrets as wild animals. We give special deference to appellee's interpretation of its own regulations. *See Dep't of Health and Mental Hygiene v. Reeders Memorial Home, Inc.*, 86 Md.App. 447, 453, 586 A.2d 1295 (1991). In this case, appellee's classification of ferrets as wild animals is also supported by ACIP, a division of the CDC. ACIP recommends that ferrets be treated as wild animals because, as its publication states:

Exotic pets (*including ferrets*) and domestic animals cross-bred with wild animals are considered wild animals by the National Association of State Public Health Veterinarians and the Conference of State and Territorial Epidemiologists because they may be highly susceptible to rabies and could transmit the disease. Because the period of rabies virus shedding in these animals is unknown, *these animals should be killed and tested rather than confined and observed when they bite humans.*

Recommendations of the Immunization Practices Advisory Committee (1991) (emphasis added).[4] Appellee's reliance on ACIP's recommendation is strong evidence that its classification of ferrets as wild animals is proper. Findings of the CDC, of which ACIP is a part, are given great deference by courts. *See John Doe v. UMMS,* 50 F.3d 1261, 1266 (4th Cir.1995). We are not persuaded, therefore, that appellee's classification of ferrets as wild animals was made in error.

▉▉▉ Appellants also complain that the trial court erred when it granted summary judgment to appellee because they claim that appellee was not required to destroy the animal as COMAR 10.06.02.06(B)(3) allows for exceptions to the rule of destruction and testing. In response to this assertion, quarantine is a *permissible* alternative in the event that a valuable wild animal bites a human, not a mandatory alternative. Appellee decided against quarantine as it was permitted to do.

Finally, appellants suggest that the trial court did not independently assess the facts but instead accepted the facts as found by the circuit court during the injunction hearing as the law of the case.[5] Appellants do not refer this Court to any portion of the trial court's opinion that suggests this is the

4. "Shedding" refers to the time during which the rabies virus lives in the saliva of an infected animal and is transferrable to a bite victim.

5. Appellants also assert that the trial court treated the circuit court's previous decision not to allow Heather Sauders to intervene in the case as though it had precedential effect. Because this will be addressed in section III of this opinion, we need not address it now.

case. Consequently, the argument is devoid of merit for lack of any evidentiary basis.

In light of the above-stated principles, appellee's decision to destroy biting ferrets is, as a matter of law, a lawful use of the State's police powers because it is rationally calculated to protect the public health. As a result, appellee was within the limits of the police power when it destroyed and tested the ferret.

## II

Appellants also contend that appellee was not entitled to judgment as a matter of law because appellee's actions constituted a compensable taking under the Fifth Amendment to the United States Constitution, applied to the State through the Fourteenth Amendment, and under the Maryland Constitution, Article III, § 40. Appellants state that these constitutional provisions prohibit the government, and by extension appellee, from taking private property for public use without providing just compensation. Appellants assert that this rule mandates that compensation be paid to a property owner when the State's exercise of its police power deprives the owner of all uses of his or her property. In this case, appellants complain that appellee completely deprived them of the value of their ferret. Hence, appellants contend that they were entitled to compensation from appellee for its taking of their ferret and that the trial court erred when it found otherwise.

The trial court granted summary judgment to appellee in part because it found that there was no compensable taking. The trial court held, and we affirm, that the taking of the ferret was a legitimate exercise of the State's police power. Citing *Ungar v. State,* 63 Md.App. 472, 482, 492 A.2d 1336, U.S. *cert. denied,* 475 U.S. 1066, 106 S.Ct. 1379, 89 L.Ed.2d 604 (1986), the trial court stated in its memorandum opinion and order that, "action pursuant to the state's police power generally does not have a ... right to compensation ... [a]nd a state may deprive an individual of property without provid-

ing compensation if the exercise of police power is fair ... even if property is destroyed." (Citations omitted.) The trial court concluded, "In this case, there is no right to compensation since [appellee] was acting fairly and validly pursuant to its police power when it had the ferret destroyed and tested for rabies."

Appellants preliminarily argue that the trial court found that there was no taking in this case because the court, citing *Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), and *Smoke Rise, Inc. v. Washington Suburban Sanitary Comm'n*, 400 F.Supp. 1369 (1975), found that "the State only takes property when it appropriates property useful to the public, not when it forbids the use of property it has deemed to be a public harm." Appellants misread the text of the trial court's opinion and order. *Mugler* and *Smoke Rise, Inc.* were cited by the trial court to distinguish the State's exercise of its police powers from that of eminent domain. The court was merely supporting its conclusion, discussed in detail *supra*, that in this case appellee was exercising the State's police powers.

Appellants also object, however, to the trial court's determination that because appellee exercised the State's police powers the taking of the ferret is not compensable. Appellants cite *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), for the proposition that the State must compensate a party for a taking effected as a result of the State's exercise of its police power if the State's action completely divests the property of all of its value. Appellants acknowledge that the State is not required to provide compensation to a property owner if the property loses all value as a result of the imposition of a regulation that merely proscribes a use that title to the property did not permit. *Id.* Appellants claim, however, that the exception does not apply in this case and that because the destruction of the ferret entirely divested them of its value they are entitled to compensation.

▮▮▮▮▮ In the case *sub judice*, appellee's seizure, destruction, and testing of appellants' animal was not a compensable taking. Although appellants argue that appellee's conduct violated both the Fifth Amendment to the United States Constitution, applied to the State through the Fourteenth Amendment, and the Maryland Constitution, Article III, § 40, we need not review appellee's conduct separately against each. We have previously stated that these constitutional provisions are substantially similar, so much so that in interpreting the Maryland Constitution, Article III, § 40, we may practically consider the Supreme Court's decisions interpreting the Fifth Amendment to be direct authority. *Dep't of Trans., Motor Vehicle Admin. and Dep't of Health and Mental Hygiene v. Armacost*, 299 Md. 392, 420, 474 A.2d 191 (1984). *See e.g. Mossburg v. Montgomery County*, 107 Md.App. 1, 666 A.2d 1253 (1995)(applies the holding in *Lucas* to Maryland law). If appellee's actions are in violation of one of the constitutional provisions, its actions are in violation of both. Initially, it must be determined whether appellee's action constitutes a taking of the animal. If it is, then we must address whether the taking is compensable.

▮▮▮▮▮ Appellee's decision to destroy and test the ferret resulted in a taking of appellants' property. The Supreme Court has long recognized that government must affect the property rights of the people in order effectively to govern. Requiring government to pay in each instance where regulation diminishes the value of personal property would handcuff the government and compel it to regulate by purchase. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). Hence, the Takings Clause places upon government regulation that results in a taking the caveat that it is subject to the dictates of justice and fairness. Regulation that results in an unjust and unfair taking, and therefor requires compensation, cannot be abstractly defined.

There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate.... Formulas and factors have been developed in a variety of settings. *Resolution of each case, however, ultimately calls*

*as much for the exercise of judgment as for the application of logic.*

*Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210 (1979) (emphasis added) (citations omitted).

An abstract test has been developed by the Supreme Court and Maryland's appellate courts, a "government restriction upon the use of property ... constitute[s] a taking in the constitutional sense, ... [and] compensation must be paid, [if] the restriction ... [is] such that it essentially deprives the owner of all beneficial uses of his property." *Maryland v. Exxon Corp.,* 279 Md. 410, 436–37, 370 A.2d 1102 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). *See also Dep't of Trans., Motor Vehicle Admin. and Dep't of Health and Mental Hygiene,* 299 Md. at 420–21, 474 A.2d 191 ("if the owner affirmatively demonstrates that the legislature or administrative determination deprives him of all beneficial use of the property, the action will be held unconstitutional"); *Sec. Management Corp. v. Baltimore County,* 104 Md.App. 234, 240–243, 655 A.2d 1326, *cert. denied,* 339 Md. 643, 664 A.2d 886 (1995) (reiterates that the Supreme Court and Maryland's appellate courts have consistently required that *all* of the value of property be deprived by government action pursuant to its police power in order for a taking to have been effected). *Cf. Lucas,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (government regulation that deprives an owner of all value associated with real property is a compensable taking). Such governmental action is considered a taking because:

If, instead, the uses of private property were subject to unbridled, uncompensated qualification under the police power, "the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]."

*Lucas,* 505 U.S. at 1014, 112 S.Ct. at 2892–93 (citations omitted) (*quoting Pennsylvania Coal Co.,* 260 U.S. at 415, 43 S.Ct. at 160). As a result, the Supreme Court stated in *Lucas* the maxim that governmental regulation enacted or taken

pursuant to the police power that goes too far shall be recognized as a compensable taking. *Id.*

In this case, appellants were deprived of all of the value of the property seized—the ferret was destroyed before it was tested. Appellee does not contend that the animal could have some residual value to appellants after its death. As noted, when, as here, the owner of property has been called upon to relinquish all value attached to the property for the common good, the government regulation compelling the surrender of the property's value has gone "too far" and the property owner has suffered a taking that is compensable. *See Lucas,* 505 U.S. at 1014–1032, 112 S.Ct. at 2892–2902.

We are mindful of this Court's *dicta* in *Ungar v. State,* 63 Md.App. at 482, 492 A.2d 1336, that has been subsequently repeated in other decisions of this Court: "If the exercise of the police power is fair, compensation for diminution in value caused by the regulation is not required, ..., *even if the property is destroyed.*" (Emphasis added (citing *Bureau of Mines v. George's Creek,* 272 Md. 143, 321 A.2d 748 (1974)).) Even so, a careful examination of *Bureau of Mines,* on which *Ungar* based the *dicta* cited above, indicates that the above-stated principle rests upon a theory specifically rejected by the Supreme Court in *Lucas.* In *Bureau of Mines,* the Court of Appeals cited *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), and adopted the proposition:

A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed *a taking or an appropriation of property* for the public benefit.... The power which the states have of prohibiting ... use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by noxious use of their property, to inflict injury upon the community.

*Bureau of Mines,* 272 Md. at 159, 321 A.2d 748. The Court of Appeals in *Bureau of Mines* and this Court in *Ungar*—which relies on *Bureau of Mines*—state that takings effected by the exercise of the State's police power are not compensable, even if they destroy the value of property, when the owners of the property are "not being permitted, by noxious use of their property, to inflict injury upon the community."

The noxious-use test, however, was rejected by the Supreme Court in *Lucas.* The Supreme Court stated:

> When it is understood that "prevention of harmful use" was merely our early formulation of the police power justification necessary to sustain (without compensation) *any* regulatory diminution in value [including the complete diminution of value]; and that the distinction between regulation that "prevents harmful use" and that which "confers benefits" [which must be compensated] is difficult, if not impossible, to discern on an objective, value free basis; it becomes self-evident that noxious-use logic cannot serve as a touchstone to distinguish regulatory "takings"—which require compensation—from regulatory deprivations that do not require compensation.

*Lucas,* 505 U.S. at 1026, 112 S.Ct. at 2898–2899. This principle, however, does not render the *dicta* in *Ungar* completely void, as we shall explain below.

At this juncture it appears that our analysis is complete and that appellants are entitled to compensation for the complete taking of their ferret. Such is not the case. As appellants recognize, a taking is not compensable if it is effected as a result of a regulation that does no more than proscribe or abate an activity for which a property owner is not entitled to use his or her property. In *Lucas,* the Supreme Court stated:

> Any limitation so severe [that it deprives a land owner of all economic value of his or her property] cannot be newly legislated or decreed (without compensation), but *must inhere in the title itself, in the restrictions that background*

*principles of the State's law of property and nuisance*
already place[d] upon land ownership.

*Id.* at 1029, 112 S.Ct. at 2900 (emphasis added). This Court
has previously explained:

> The Supreme Court [in *Lucas* ] reasoned that under common-law . . . no owner of land had any right to use his land
> in a manner harmful to others. Accordingly, a regulation
> . . . preventing or abating such an unlawful use took nothing
> at all. . . .

*Offen v. Prince George's County,* 96 Md.App. 526, 553–54, 625
A.2d 424 (1993), *rev'd on other grounds,* 334 Md. 499, 639 A.2d
1070 (1994).

We recognize that the above-stated principles address
the taking of real property and the occasions when such a
taking is not compensable despite the loss to the landowner of
100% of the value of his or her property. Their application to
personal property is a natural extension. In cases involving
personal property, however, the mere deprivation of 100% of
its *economic* value is not sufficient to invoke this test for
compensation. In *Lucas,* the Supreme Court reiterated the
longstanding principle that,

> in the case of personal property, by reason of the State's
> traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that
> new regulation might even render his property *economically* worthless (at least if the property's only economically
> productive use is sale or manufacture for sale).

*Lucas,* 505 U.S. at 1027–28, 112 S.Ct. at 2899–2900 (emphasis
added)(*citing Andrus,* 444 U.S. at 66–67, 100 S.Ct. at 327).
The Supreme Court, therefore, recognized that, unlike its
dealings with real property, government may deprive an owner of personal property of all of that property's economic value
through regulation without owing compensation. In this
sense, the dicta in *Ungar* accurately states one aspect of
takings law. *Andrus,* the case the Court relied on to support
its point, however, also makes clear that an owner of personal
property may not be deprived of all of its value without

compensation. In *Andrus*, as noted above, the Supreme Court held that owners of personal property were not entitled to compensation under the Fifth Amendment despite the fact that government regulation had denied them all of the value of that property. The Court stated that this was because, even though the property had lost most of its value, it still had some residual economic value. Additionally, the Supreme Court noted that the economic value of personal property is but one strand in a bundle of property rights. In other words, there was no compensable taking because the owners of the personal property could still enjoy its use, they were simply barred from making a profit from it. As the Supreme Court stated, "it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the [property]." *Andrus*, 444 U.S. at 66, 100 S.Ct. at 327. We are convinced, therefore, that in a case such as this where the entire bundle of property rights has been destroyed, the Fifth Amendment requires compensation for the taking unless, as stated above, the government regulation does no more than prohibit or abate a public nuisance for which the property owner did not possess the right to use his property in the first place. *Lucas*, 505 U.S. at 1027–29, 112 S.Ct. at 2899–2900. *But see Keystone Bituminous Coal Assoc. v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).[6]

---

**6.** In this pre-*Lucas* case the Supreme Court considered whether a Pennsylvania law that required coal mine owners to leave 50% of the coal beneath certain structures to be left in place to provide surface support was a taking under the Fifth Amendment. In that case, the Supreme Court cited *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), another takings case in which the Supreme Court held that a Virginia regulation was not a Fifth Amendment taking even though it required the destruction of infected cedar trees because they could have spread the disease to nearby apple orchards. Speaking of *Miller*, the Supreme Court stated:

In upholding the state action, the Court did not consider it necessary to "weigh with nicety the question whether the infected cedars constitute a nuisance according to common law; or whether they may be so declared by statute." Rather, it was clear that the State's exercise of its police power to prevent the impending danger was justified, and did not require compensation.

In the case *sub judice*, appellee's regulations did no more than

> duplicate the result that could have been achieved in the courts—by adjacent land owners (or other uniquely affected persons) under the State's law of private nuisance, *or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise.*

*Lucas*, 505 U.S. at 1029, 112 S.Ct. at 2900 (emphasis added). In this case, the destruction of the ferret, a wild animal that had bitten an individual and could have spread the rabies virus, was intended to abate a "nuisance"—rabies.[7] An animal infected with a dangerous disease constitutes a public nuisance that may be controlled by the State. *See Dep't of Health v. Heim*, 357 N.W.2d 522 (S.D.1984); *Dep't of Agriculture v. Hill*, 66 Dauph. 231 (Pa.Com.Pl.1954); *Stickley v. Givens*, 176 Va. 548, 11 S.E.2d 631 (1940); *Kroplin v. Truax*, 119 Ohio St. 610, 165 N.E. 498 (1929); *Durand v. Dyson*, 271 Ill. 382, 111 N.E. 143 (1916); 27 Op.Atty.Gen. 384, (Ca.1956). Although, in this case, appellee was not certain that the animal was infected at the time of the taking, because testing of an animal is necessary before it can be known whether it has rabies, and because the disease is fatal to humans, a biting, wild animal represents a public nuisance due to the mere risk of infection

---

*Keystone Bituminous Coal Assoc.*, 480 U.S. at 490, 107 S.Ct. at 1244–45. This does not alter our analysis in this case. *Keystone Bituminous Coal Assoc.* is a *takings* case. This is explicitly recognized by the Court, which states, "Other subsequent cases reaffirm the important role that the nature of the state action plays in our *takings analysis.*" *Id.* (emphasis added). In both *Keystone Bituminous Coal Assoc.* and *Miller*, the complaining party was not deprived of 100% of the value of his land and, therefor, no taking existed. In *Keystone Bituminous Coal Assoc.*, the mines still had value, the owners merely were deprived of half the coal underneath surface structures. In *Miller*, the landowner still had the value of the land, just not the trees. Our holding in this case, therefor, is in accord with the ideas expressed in *Keystone Bituminous Coal Assoc.*

7. Appellants attempt at this juncture to reargue the appropriateness of appellee's classification of ferrets as wild animals, as well as appellee's° conclusion that ferrets must be destroyed and tested if they bite a human, but as, we addressed these arguments in I above, we shall not do so again here.

it represents to humans. Without question, appellants are entitled to have a pet ferret. They are not, however, entitled to keep a ferret that represents a possible health risk. Once the ferret bit Christina, the State, through appellee, had the power to address the grave, life-threatening danger posed to her in the form of the possibility of rabies.

Hence, although the seizure, destruction, and testing of the ferret was a taking, because that taking merely denied appellants the right to use their property in an already prohibited manner, there was no compensable taking. Appellants cite *Yancey v. United States*, 915 F.2d 1534 (Fed.Cir.1990) and *Dep't of Agric. v. Mid–Florida Growers*, 521 So.2d 101 (Fla.), U.S. *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988) to support their argument that appellee in this case effected a compensable taking. These cases are inapposite to this case. In *Yancey*, the federal circuit applied a different test to determine whether a compensable taking occurred. In that case, which involved the taking of investment related property, the court identified three factors that helped it reach its determination of whether a compensable taking was effected: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Id.* at 1539 (citations omitted). This test is not applicable to this case. If it were, however, it would not help appellants—the economic impact on appellants was minimal; the record shows no investment-related expectations [8] for appellants; and the governmental action is of great importance—protecting the public health. Were we to apply this test, we would find that no compensable taking occurred.

*Dep't of Agric.* is also inapplicable to this case. In that case, the State of Florida destroyed citrus trees it had tested and found to be disease free in order to stem the tide of an infectious disease. The Supreme Court of Florida held that

---

8. We do not mean to say there exists an investment backed expectations test separate and apart from the viable economic use test. *See Offen, supra.*

the State's action constituted a compensable taking because the State was aware of the fact that the trees were healthy. It stated, "just compensation [is] a clear requisite ... to the act of destroying *healthy* trees." *Dep't of Agric.*, 521 So.2d at 104 (emphasis added). Equally clear to that court, however, was its observation that

> when the state, in its exercise of the police power, destroys decayed fruit, unwholesome meats or diseased cattle, the constitutional requirement of "just compensation" clearly does not compel the state to reimburse the owner for the property destroyed because such property is valueless, *incapable of any lawful use, and a source of public danger.*

*Id.* (emphasis added). In the case *sub judice,* a biting ferret is a public nuisance that poses a threat to human health. The animal cannot be tested for rabies prior to destruction. In such a case, the principles stated in *Dep't of Agric.* lead to only one possible conclusion—that no compensable taking has occurred.

Because the trial court did not err when it granted summary judgment to appellee, we need not address appellants' contention that Heather Sauders was improperly kept from joining the lawsuit against appellee.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**