688 A.2d 1

Stuart O. SIMMS, et al.

v.

Nicholas CONSTANTINE, et al.

Stuart O. SIMMS, et al.

v.

Chris WADE, et al.

Nos. 1628, 1629, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Jan. 29, 1997.

Andrew H. Baida, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellants.

Barry S. Brown, Baltimore, for Appellees.

Argued before MOYLAN, HOLLANDER and EYLER, JJ.

MOYLAN, Judge.

The appellants are Stuart O. Simms, who was at the time of the alleged acts that form the basis for the complaint in this case the State's Attorney for Baltimore City, and Haven Kodeck, who was at the same time an Assistant State's Attorney for Baltimore City. Both appellants were sued, along with the Mayor of Baltimore City, Kurt L. Schmoke, and the then Police Commissioner of Baltimore City, Edward V. Woods,[1] in the Circuit Court for Baltimore County by three former Baltimore City policemen, the appellees Nicholas Constantine, Chris Wade, and John Mohr, for malicious prosecution and other closely-related tortious acts. The appellants moved to have the complaint against them dismissed on the ground that they enjoyed absolute prosecutorial immunity. Judge Christian M. Kahl denied their motion and this interlocutory appeal has followed.

The single issue before us is whether the governmental immunity, unquestionably enjoyed by the appellants in one form or another for the performance of their official duties, is of the absolute variety or only of the qualified variety. The answer is that for prosecutors it is sometimes the one and sometimes the other, depending upon the particular prosecutorial function for which they are invoking immunity.

---

1. Also listed as a defendant was the Mayor and City Council of Baltimore, as a governmental unit.

## *The Appellate Lens Through Which The Alleged Facts Are To Be Viewed*

Let it be clear, as we set the necessary factual backdrop for the discussion that is to follow, that we are referring not to evidence but only to allegations. There has yet been no evidentiary hearing at which either side has had an opportunity to present evidence and at which the other side has had an opportunity to test, to challenge, or to contradict such evidence or to present countervailing evidence. We are dealing only with allegations.

The appellants' motion to dismiss was made pursuant to Maryland Rule 2–322 (Preliminary Motions), which, in subsection (b), provides in pertinent part:

> **Permissive.**—The following defenses may be made by motion to dismiss filed before the answer, if an answer is required: ... (4) governmental immunity ...

In discussing appellate review of a trial judge's decision with respect to a motion to dismiss under Rule 2–322(b), Judge Bloom, in *Bennett Heating & Air Conditioning, Inc. v. NationsBank of Maryland,* 103 Md.App. 749, 757, 654 A.2d 949 (1995), *rev'd in part on other grounds,* 342 Md. 169, 674 A.2d 534 (1996), articulately set out the appropriate standard of review:

> In reviewing the grant [or the denial] of a motion to dismiss pursuant to Maryland Rule 2–322(b), "we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings." *Sharrow v. State Farm Mut. Auto. Ins. Co.,* 306 Md. 754, 768, 511 A.2d 492 (1986). "[T]he complaint should not be dismissed unless it appears that no set of facts can be proven in support of the claim set forth therein." *Ungar v. State,* 63 Md.App. 472, 479, 492 A.2d 1336 (1985), *cert. denied,* 475 U.S. 1066, 106 S.Ct. 1379, 89 L.Ed.2d 604 (1986).

*See also Sharrow v. State Farm Mut. Auto. Ins. Co.,* 306 Md. 754, 768, 511 A.2d 492 (1986); *Tadjer v. Montgomery County,* 300 Md. 539, 542, 479 A.2d 1321 (1984); *Hoffman v. Key Fed.*

*Sav. & Loan,* 286 Md. 28, 33–34, 416 A.2d 1265 (1979); *Schwartz v. Merchants Mortgage Co.,* 272 Md. 305, 307–08, 322 A.2d 544 (1974).

A long line of Maryland cases has consistently affirmed the fact that in ruling on a motion to dismiss (or, in earlier cases, ruling on a demurrer), both the trial court and the reviewing appellate court shall assume to be true not only all of the well pleaded facts in the complaint but also "the inferences which may be reasonably drawn from those well pleaded facts." *Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 333–34, 624 A.2d 496 (1993); *Citizens Planning & Housing Ass'n v. County Executive,* 273 Md. 333, 337–38, 329 A.2d 681 (1974); *Hall v. Barlow Corp.,* 255 Md. 28, 42, 255 A.2d 873 (1969); *Parish v. Maryland and Virginia Milk Producers Ass'n,* 250 Md. 24, 71, 242 A.2d 512 (1968), *cert. denied,* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); *Killen v. Houser,* 239 Md. 79, 83, 210 A.2d 527 (1965).

In characterizing the prism or lens through which both the trial court and the appellate court should examine a complaint that is being subjected to a motion to dismiss, *Ungar v. State,* 63 Md.App. 472, 492 A.2d 1336 (1985), *cert. denied,* 475 U.S. 1066, 106 S.Ct. 1379, 89 L.Ed.2d 604 (1986), explained that the complaint need not specify with minute particularity every fact that need ultimately be proved. It is enough that the complaint state with reasonable certainty the cause of action. A motion to dismiss should not be granted unless it appears that no plausible evidence could be offered to support the claim. As Judge Robert M. Bell (now of the Court of Appeals) observed for this Court in *Ungar,* 63 Md.App. at 479, 492 A.2d 1336:

[W]ell pleaded allegations of fact contained in the complaint are taken as true and the complaint should not be dismissed *unless it appears that no set of facts can be proven in support of the claim* set forth therein. (Emphasis supplied).

Judge Bell relied not only on *Nistico v. Mosler Safe Co.,* 43 Md.App. 361, 363, 405 A.2d 340 (1979), but also on *Baltimore Import Car Serv. & Storage, Inc. v. Maryland Port Auth.,* 258

Md. 335, 339–40, 265 A.2d 866 (1970). That case, in turn, relied on and quoted with approval the following statement from *Smith v. Shiebeck,* 180 Md. 412, 420, 24 A.2d 795 (1942):

> The material facts essential to the complainant's right to obtain relief should be alleged, but a general statement of the facts is sufficient. It is not necessary to state minutely all the circumstances which may conduce to prove the general charge, as these circumstances are properly matters of evidence which need not be recited to enable them to be admitted as proof. Even though every particular circumstance is not stated, the bill will be held sufficient if it states the complaint with reasonable certainty, clearness and accuracy so as to apprise the defendant of the nature of the claim brought against him. (Citations omitted).

*See also Flaherty v. Weinberg,* 303 Md. 116, 135–36, 492 A.2d 618 (1985); *Morris v. Osmose Wood Preserving,* 99 Md.App. 646, 652–53, 639 A.2d 147 (1994), *aff'd in part and rev'd in part,* 340 Md. 519, 667 A.2d 624 (1995).

It was Judge Adkins in *Berman v. Karvounis,* 308 Md. 259, 264, 518 A.2d 726 (1987), who then articulated the decided slant or bias that an appellate court should adopt in viewing the presumptively true allegations and all of the inferences that can reasonably be drawn from them:

> Since we are dealing with a motion to dismiss, we consider appellants' well-pleaded allegations in the light most favorable to them.

*See also Board of Educ. v. Browning,* 333 Md. 281, 286, 635 A.2d 373 (1994); *Baker v. Miles & Stockbridge,* 95 Md.App. 145, 186, 620 A.2d 356 (1993).

In *Faya v. Almaraz,* 329 Md. 435, 443, 620 A.2d 327 (1993), Chief Judge Murphy wrote to the same effect:

> In determining whether the trial court erred in granting the motions to dismiss, we must accept as true all well-pleaded facts and allegations in the complaints, together with reasonable inferences properly drawn therefrom. Dismissal is proper only if the facts and allegations, so viewed, would nevertheless fail to afford plaintiff relief if proven.

See also *Davis v. DiPino,* 337 Md. 642, 648, 655 A.2d 401 (1995); *A.J. Decoster Co. v. Westinghouse Electric Corp.,* 333 Md. 245, 249, 634 A.2d 1330 (1994); *Briscoe v. City of Baltimore,* 100 Md.App. 124, 128, 640 A.2d 226 (1994).

 What these guidelines must produce should be very clear. The narrative that follows may appear to be slanted and one-sided, but that is inevitable when the allegations of the complainants are all we have to go on. A freely acknowledged slant in support of sustaining the viability of the complaint is, moreover, mandated at this stage of the proceedings on this particular issue (the pre-trial dismissal of a complaint). A denial of a motion to dismiss a complaint says nothing about the merits of the complaint. It only establishes that the complaint states a cause of action that is entitled to a full evidentiary examination to see to what extent the allegations may be true.

### *The Factual Allegations in the Light Most Favorable to the Appellees*

The taproot of all of the difficulty in this case was the execution of a search and seizure warrant at 2814 Taney Road in Baltimore City on July 17, 1991. The warrant, authorizing a search for illegal drugs, was issued by a judge of the Circuit Court for Baltimore City. The affiant on the warrant was one of the appellees, Officer Nicholas S. Constantine. The warrant was based, in whole or in part, on information received by Officer Constantine from a confidential police informant. The other appellees, Officer Chris Wade and Officer John Mohr, although not affiants on the warrant application, participated with Officer Constantine in the execution of the warrant.

The homeowner at 2814 Taney Road, chagrined at the police invasion, denied that there were any illegal drugs on the premises. He identified himself, moreover, as a cousin of the wife of Mayor Schmoke. He informed the three officers that "he would, in effect, solicit the Mayor's intervention into the situation." The three officers allege that they "had no knowl-

edge whatsoever that the home they intended to search was owned and/or rented" by a cousin of the Mayor's wife.

A key allegation that followed was that the Mayor, "after having been notified of the attempted search of said residence, broke the normal chain of command as it existed within the hierarchy of the Baltimore City Police Department, personally intervened into the matter, and interfered with the lawful search of the premises by [the three officers] involved in the raid." A more concrete allegation is that even while the search was in progress, someone higher in the chain of command did somehow intervene and, as a result, the three officers "were forbidden and prevented from completing the search of the residence in question."

How the order to terminate the search was communicated to the officers, who issued such an order, who requested that such an order be issued, what basis there could have been for overriding the judicially-issued order to execute the search, and how the termination process could have been effectuated with such speed are, of course, questions that must abide discovery or an evidentiary hearing. Even taking all inferences in the light most favorable to the appellees, however, the State's Attorney and the Assistant State's Attorney would not even inferentially be implicated in the events surrounding the termination of the search on July 17, 1991. The significance of the allegations with respect to the events of that night is that, viewing the matter in the light most favorable to the appellees, they supply the motivation, arguably retaliatory, for the investigations and the prosecutions of the officers that followed.

The three officers allege that "the Mayor ... viewed the raid in question as a personal affront to himself, his political career and/or his family and sought to avenge either himself or his family for the July 17 raid." It is alleged that, because of "the Mayor's desire to avenge the perceived affront to his career and his family," he "retaliated" against the three officers "by initiating and/or causing the initiation of a criminal prosecution of their actions as they related to the [July 17,

1991] search in question and to other actions in which [they] had engaged as police officers, including but not limited to search warrants for which they had made application prior to the raid of July 17, 1991."

It is further alleged that because of the Mayor's animus toward the officers because of "the perceived affront to his career and his family," he "enlisted the assistance of" State's Attorney Simms, Assistant State's Attorney Kodeck, and Police Commissioner Woods. With respect to these three additional defendants, it is further alleged that they "either of their own volition or in response to personal and political pressure imposed upon them by the Mayor, carried out the Mayor's direction to institute criminal charges against" the three officers. With respect to the appellants Simms and Kodeck, it is alleged that they "manipulated evidence and, in effect, falsified evidence against [the three officers] so as to cause the initiation of criminal prosecutions against them and to ensure that an indictment against them would be forthcoming."

When later in this opinion we turn our attention to the question of whether the prosecutorial activities of the appellants, Simms and Kodeck, were part of their "investigative" function or part of their "adjudicative" function, the timing of whatever actions were taken against the officers may take on significance.

On November 1, 1991, three-and-a-half months after the search on Taney Road, the Baltimore City Grand Jury indicted Officer Constantine for perjury. It was charged that he perjured himself in his affidavit in support of his application for the search warrant. There is no indication of who, other than inferentially the four defendants in this complaint, might have initiated the perjury charge; of who investigated the possibility of perjury; or of who testified as a witness before the Grand Jury. Someone had to pull the search warrant application from the case file, to examine the supporting affidavit allegation by allegation, and then to go to some investigative lengths to run down the truthfulness or falsity of

the various allegations. At this stage of the proceedings, however, there is not sufficient detail available to conclude with any certainty what the allegedly perjurious statement or statements may have been, what the investigation of perjury consisted of, and who conducted that investigation. The allegation charges the two appellants in this appeal with having "manipulated evidence" and "falsified evidence" against Officer Constantine so as "to ensure that an indictment against him would be forthcoming."

Only Officer Constantine was charged with perjury with respect to the Taney Road search warrant. The other two officers were not affiants on that warrant application and were not charged with that or any other violation as of November 1, 1991. They did not, however, remain unscathed. The officers allege that as a direct consequence of the July 17, 1991 search of 2814 Taney Road, they "were investigated over a period of years." Officers Wade and Mohr further allege that, as a result of the investigation, they "were removed from duty as Drug Enforcement Officers, [and] given menial positions within the Baltimore City Police Department that were beneath their ability and accomplishments."

Inferentially, the investigative mill did not stop grinding as of that first indictment of Officer Constantine on November 1, 1991. Three-and-one-half months later, on February 14, 1992, a batch of indictments was handed down by the Baltimore City Grand Jury against all three officers. An additional indictment was filed against Officer Constantine, charging a separate case of perjury in an application for another search warrant obtained at some time prior to the obtaining of the July 17, 1991 search warrant for Taney Road. Officer Wade was also charged with perjury in applying for a search warrant at some time prior to July 17, 1991. Officer Mohr was charged with two such acts of perjury, also for warrants obtained prior to July 17, 1991.

Looking at these spare allegations in the light most favorable to the appellees, it may be inferred that there is usually one affiant per warrant application and that the four charges

of perjury represent, therefore, four separate warrant applications. Again, drawing all plausible inferences and looking at them in the light most favorable to the appellees, it is reasonable to assume that an extensive examination of numerous warrant applications was involved in coming up with these four additional charges of perjury. An extensive combing of files and a painstaking examination of those files involves something quite distinct from the day-to-day, garden-variety filing of routine criminal charges. The reasonable inference is that of a high-intensity investigative effort.

We have nothing but the allegations of the three officers as to a possible motive for such an obviously major investigative effort. Even if a close scrutiny of the application for the Taney Road search warrant were called for, what explanation is there for examining other and earlier warrant applications filed by Officer Constantine? Were there prior complaints about him? Who ordered such an investigation? Who conducted such an investigation? How long did it go on? Officers Wade and Mohr had not even been involved in applying for the Taney Road search warrant. Why were their earlier records also pulled and investigated? There may be innocuous answers to those obvious questions, but they are not before us at this stage of the proceedings.

All three officers also allege that all charges against them were ultimately "dismissed as being legally insufficient and otherwise baseless." As a result of the February 14, 1992 indictments, however, all three officers were "arrested and placed in jail."

When we come to examine the critical distinction between the adjudicative function of a prosecutor's office, on the one hand, and the investigative function or the administrative function of a prosecutor's office, on the other hand, one other allegation may take on significance. All three officers allege that at "some point during the criminal investigation and/or prosecution of them," Assistant State's Attorney Kodeck "offered to refrain from charging [them] with criminal activity or to dismiss charges already instituted against them were they

to resign from their employment with the Baltimore City Police Department." Looking at that allegation in the light most favorable to the appellees, it is inferable that an Assistant State's Attorney would not take such a step without first consulting with others involved with him in a presumably high-intensity and major investigation.

It was also alleged by each of the officers that the activities of all four defendants were undertaken not simply with the intention of bringing criminal charges against them but "were also undertaken with the intent and with the desire that [the officers] resign or be pressured into resigning from the Baltimore City police force."

Assuming, as we must when examining a Motion to Dismiss, the truth of all of those facts contained in the pleadings, and looking at all the reasonable inferences that can be drawn from those facts in the light most favorable to the complainants, can it be said that the appellants, Simms and Kodeck, enjoyed absolute prosecutorial immunity, as a matter of law, and were, therefore, entitled to have their Motion to Dismiss granted? To answer that question, we must examine the nature of prosecutorial immunity.

### Supreme Court Precedents As Highly Persuasive Authority

With the exception of judicial immunity, the forays of the Maryland case law into the broad subject of the immunity of governmental officials from civil suits for tortious acts have been modest. Indirectly if not directly, however, there is a vast repository of case law that has received the stamp of approval by the Maryland courts.

In *Parker v. State,* 337 Md. 271, 276–291, 653 A.2d 436 (1995), Judge Eldridge engaged in a thorough-going and perceptive tracing of the subject of judicial immunity. Though of only tangential applicability to the question of prosecutorial immunity now before us, the *Parker v. State* analysis was illuminating in several regards. Generally speaking, judicial immunity is the fountainhead from which our immunity law

has flowed; other varieties of governmental immunity have branched off from it. Judge Eldridge referred to judicial immunity as a "common law defense" and traced the principle, as "part of the common law," to as early as 1607. He traced the development of that doctrine through subsequent English case law and then to the broad body of case law articulated by the Supreme Court of the United States, beginning with *Bradley v. Fisher*, 13 Wall. 335, 20 L.Ed. 646 (1872), "which remains today the leading American case on judicial immunity." 337 Md. at 280, 653 A.2d 436. One statement made in *Parker v. State* with respect to judicial immunity is equally pertinent to other varieties of governmental immunity:

> The common law principle of absolute judicial immunity for judicial acts has neither been abrogated nor been modified in Maryland.[7]
>
> [7] The Maryland Declaration of Rights, Art. 5, provides that "the Inhabitants of Maryland are entitled to the Common Law of England" except to the extent that the common law has been changed by the legislature or by this Court.

337 Md. at 283, 653 A.2d 436.

Although the almost absolute quality that judicial immunity enjoyed at the common law has remained essentially intact, there has been a marked retreat from absolute immunity (and, concomitantly, a marked departure from the common law) with respect to other forms of governmental immunity. In *Mandel v. O'Hara*, 320 Md. 103, 113, 576 A.2d 766 (1990), dealing with the immunity of the Governor when acting in his legislative capacity, Judge Rodowsky noted this general trend:

> Previously, high officials in the executive department enjoyed an absolute immunity. Currently, however, there is a "federal retreat from absolute immunity in its most stringent form[.]" Prosser § 132, at 1062. Whether an official of the executive department enjoys a § 1983 immunity, and whether that immunity is absolute or qualified, is determined in relation to the function which gives rise to the federal law claim.

What is pertinent for present purposes is that Judge Rodowsky then undertook a thorough survey of the prevailing

law on governmental immunity, 320 Md. at 112–21, 576 A.2d 766, and thirteen of the fifteen cases he discussed were opinions of the Supreme Court of the United States. By the same token, the analysis of the law governing the immunity of governmental officials in *Parker v. State* discussed no less than ten opinions of the Supreme Court of the United States. What emerges from these cases, and from other cases as well, is that the extensive case law emanating from the Supreme Court of the United States on the subject of the immunity of governmental officials, albeit not of constitutional dimension and not, therefore, binding authority in Maryland, is nonetheless a highly persuasive body of law to which this State has regularly looked for enlightenment.

Indeed, in *Mandel v. O'Hara*, 320 Md. at 112–113, 576 A.2d 766, Judge Rodowsky referred to the highly persuasive character of the federal case law on the subject of immunity of public officials:

> For at least the past two decades in the United States the principal vehicles for developing law concerning public official immunity have been actions under 42 U.S.C. § 1983 (1982). The Supreme Court has said that "§ 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler v. Pachtman* [424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128] (1976). Thus, § 1983 cases and their first cousins, tort actions based directly on certain alleged violations of the United States Constitution by officials of the federal government, may be persuasive authority as to the Maryland common law of public official immunity in a state law, nonconstitutional tort action against a state official, as presented here. (Footnote and citations omitted).

On only one prior occasion has the specific subject of prosecutorial immunity reached the appellate courts of this State. In *Gersh v. Ambrose*, 291 Md. 188, 434 A.2d 547 (1981), a Baltimore City Assistant State's Attorney raised the defense of absolute immunity for an action allegedly undertaken in his prosecutorial capacity. At the outset, the Court of Appeals

acknowledged that that specific issue had never before been considered in Maryland:

> Gersh maintains that he is entitled to absolute immunity ... as a prosecutor ... If he is entitled to [that defense], such immunity would completely bar suit. *We have never considered the extent to which a prosecutor may be entitled to absolute immunity outside of a judicial proceeding.*[2]

(Emphasis supplied) 291 Md. at 189–90, 434 A.2d 547. The *Gersh* opinion tentatively looked to the Supreme Court decision of *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), as the authority on which it might rely if it were necessary to address the merits. It mentioned the distinction that *Imbler* had made between those prosecutorial duties "intimately associated with the judicial phase of the criminal process," on the one hand, and other prosecutorial functions that "cast him in the role of an administrator or investigative officer rather than that of an advocate," on the other hand. In the last analysis, however, the *Gersh* opinion was able to finesse any consideration of the merits of that issue on another ground that obviated any close examination of the particular prosecutorial function being performed.

In contrast with Maryland, the Supreme Court has developed an extensive body of law dealing with the subject of prosecutorial immunity. It is to that body of law that we now shall turn.

### A Trilogy of Supreme Court Cases

The contours of prosecutorial immunity have, over the course of seventeen years, been thoroughly explored by the Supreme Court in a trilogy of cases: 1) *Imbler v. Pachtman,*

---

**2.** There is apparently an absolute immunity for prosecutors for their actions in the course of judicial proceedings. *Eliason v. Funk,* 233 Md. 351, 356, 196 A.2d 887 (1964), made, as part of a quick general survey of immunity law, the following statement:

> It has been held that judges have an absolute privilege from suits arising out of their judicial acts. Prosecutors in judicial hearings are afforded the same privilege. (Citations omitted).

*See also Mandel v. O'Hara,* 320 Md. 103, 110, 576 A.2d 766 (1990).

424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); 2) *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991); and 3) *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

### A. *Imbler v. Pachtman*

In 1961, Paul Imbler was convicted in a California state court of first-degree felony-murder and was sentenced to death. Over the course of the next eight years, a series of post-trial proceedings were held, which are not directly pertinent here. The next significant development, for present purposes, is that on a *habeas corpus* petition, a Federal District Court reversed Imbler's conviction. *Imbler v. Craven*, 298 F.Supp. 795 (C.D.Cal.1969). After that decision was affirmed by the Court of Appeals for the Ninth Circuit, *Imbler v. Pachtman*, 500 F.2d 1301 (9th Cir.1974), the State of California chose not to retry Imbler and he was released.

In April of 1972, Imbler filed a civil rights action, under 42 U.S.C. § 1983,[3] against, *inter alia*, Richard Pachtman, the Deputy District Attorney who had prosecuted him at the original trial. Pachtman claimed absolute prosecutorial immunity and requested that the complaint be dismissed as to him. Affirming the decisions of the District and the Circuit Courts, the Supreme Court concluded that Pachtman enjoyed absolute immunity because the acts charged against him "were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." 424 U.S. at 430, 96 S.Ct. at 995.

---

**3.** What is now codified as 42 U.S.C. § 1983 is taken from the Civil Rights Act of 1871. Specifically, it provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or cause to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The Supreme Court described, 424 U.S. at 416, 96 S.Ct. at 988, the particular prosecutorial acts that were the basis for Imbler's § 1983 claim:

> The gravamen of his complaint against Pachtman was that he had "with intent, and on other occasions with negligence" allowed Costello to give false testimony as found by the District Court, and that the fingerprint expert's suppression of evidence was "chargeable under federal law" to Pachtman. In addition Imbler claimed that Pachtman had prosecuted him with knowledge of a lie detector test that had "cleared" Imbler, and that Pachtman had used at trial a police artist's sketch of Hasson's killer made shortly after the crime and allegedly altered to resemble Imbler more closely after the investigation had focused upon him.

These were acts intimately associated with the prosecutor's presentation of the State's case at the trial table.

In *Imbler*, the Supreme Court first made it clear that immunities for governmental officials under § 1983 and the common law tort immunities of such officials were essentially indistinguishable. Although the Civil Rights Act of 1871 "on its face admits of no immunities," 424 U.S. at 417, 96 S.Ct. at 988–89, the Supreme Court cited a series of its earlier cases dealing with other varieties of governmental immunity and concluded that § 1983 implicitly incorporates those immunities that are "well grounded in history and reason." 424 U.S. at 418, 96 S.Ct. 984. It concluded "that § 1983 is to be read in harmony with general principles of tort immunities and defenses." *Id.* "[T]he considerations underlying the nature of the immunity of the respective officials in suits at common law led to essentially the same immunity under § 1983." 424 U.S. at 419, 96 S.Ct. at 990.

Turning specifically to the subject of prosecutorial immunity, the Court acknowledged:

> This case marks our first opportunity to address the § 1983 liability of a state prosecuting officer.

424 U.S. at 420, 96 S.Ct. at 990.

After examining the pros and cons of both qualified immunity and absolute immunity, the Supreme Court concluded that

with respect to those prosecutorial activities that are "intimately associated with the judicial phase of the criminal process," 424 U.S. at 430, 96 S.Ct. at 995, the "common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties." 424 U.S. at 422–23, 96 S.Ct. at 991. With respect to the performance of those functions, the holding of the Supreme Court was clear:

> We conclude that the considerations outlined above dictate the same absolute immunity under § 1983 that the prosecutor enjoys at common law.

424 U.S. at 427, 96 S.Ct. at 993. As the Supreme Court worked through its analysis, its focus on the prosecutor's preparation for and conduct of the trial was clear:

> Attaining the system's goal of *accurately determining guilt or innocence* requires that both the prosecution and the defense have wide discretion in *the conduct of the trial* and *the presentation of evidence.* The veracity of witnesses in criminal cases frequently is subject to doubt before and after they testify, as is illustrated by the history of this case. If prosecutors were hampered in exercising their judgment as to *the use of such witnesses* by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence.
>
> The ultimate fairness of the operation of the system itself could be weakened by subjecting prosecutors to § 1983 liability. Various post-trial procedures are available to determine *whether an accused has received a fair trial.*

424 U.S. at 426–27, 96 S.Ct. at 993 (Footnotes omitted; emphasis supplied).

Although *Imbler v. Pachtman* was a case in which the prosecutorial immunity in question was of the absolute variety, the opinion was careful to point out that there may well be other prosecutorial functions which enjoy only qualified immunity:

> It remains to delineate the boundaries of our holding ...
> [T]he Court of Appeals emphasized that each of respon-

dent's challenged activities was an "integral part of the judicial process." The purpose of the Court of Appeals' focus upon the functional nature of the activities rather than respondent's status was to distinguish and leave standing those *cases*, in its Circuit and in some others, *which hold that a prosecutor engaged in certain investigative activities enjoys not the absolute immunity associated with the judicial process, but only a good-faith defense comparable to the policeman's.*

424 U.S. at 430, 96 S.Ct. at 994–95 (citations omitted; emphasis supplied). The Supreme Court, however, deliberately left the consideration of that possible distinction for another day:

We agree with the Court of Appeals that respondent's activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force. *We have no occasion to consider* whether like or similar reasons require immunity for *those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate.*

424 U.S. at 430–31, 96 S.Ct. at 995 (footnote omitted; emphasis supplied).

It acknowledged that drawing the line between different prosecutorial functions may be difficult. It consoled itself with the fact that the case before it "does not require us to anticipate" those difficult questions:

We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.

424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33.

Thus, as of that 1976 decision, the handwriting at least was on the wall as to a possible future distinction, with regard to

their respective governmental immunities, among a prosecutor's 1) judicial, 2) administrative, and 3) investigative functions.

## B. *Burns v. Reed*

Fifteen years were to go by before the Supreme Court, in *Burns v. Reed,* 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), had the occasion to take up the question it had deferred in *Imbler v. Pachtman.* Even during that period of deferred consideration, however, the Court did on one occasion note that the United States Courts of Appeals were generally ruling that prosecutors did not enjoy absolute immunity for all of their functions:

> In *Imbler v. Pachtman,* this Court reserved the question whether absolute immunity would extend to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer." Since that time the Courts of Appeals generally have ruled prosecutors do not enjoy absolute immunity for acts taken in those capacities.

*Harlow v. Fitzgerald,* 457 U.S. 800, 811 n. 16, 102 S.Ct. 2727, 2734 n. 16, 73 L.Ed.2d 396 (1982) (citation omitted).

Even three years before the *Burns v. Reed* opinion was handed down, its harbinger appeared in the form of *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). In that case, even the granite-like monolith of absolute judicial immunity was cracked by the wedge of functional analysis. An administrative decision (the firing of an employee) taken by a judge was held to be an act for which the judge did not enjoy absolute immunity:

> When applied to the paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of a court, the doctrine of absolute judicial immunity has not been particularly controversial. *Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by*

*judges.* Here, as in other contexts, immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches.

484 U.S. at 227, 108 S.Ct. at 544 (emphasis supplied; emphasis in original).

Pointing to a number of its cases involving a variety of high-level officials (the governor of a state, a federal cabinet secretary, aides to the President of the United States),[4] the Supreme Court distilled the essence of the functional approach that is now the primary criterion for separating instances of absolute immunity from instances of only qualified immunity:

Running through our cases, with fair consistency, is a "functional" approach to immunity questions other than those that have been decided by express constitutional or statutory enactment. Under that approach, we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions. *Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy,* and the Court has recognized a category of "qualified" immunity that avoids unnecessarily extending the scope of the traditional concept of absolute immunity.

484 U.S. at 224, 108 S.Ct. at 542 (emphasis supplied).

Three years later, *Burns v. Reed* became the perfect test tube case for applying functional analysis to prosecutorial immunity. A prosecuting attorney was sued civilly for three separate actions: 1) advising the police that they could place a suspect under hypnosis before taking a statement from her; 2) advising the police, after the hypnotized statement had been obtained, that there was probable cause to arrest the suspect;

---

4. *See Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

and 3) presenting those results at a probable cause hearing before a warrant-issuing magistrate. Both the District Court and the United States Court of Appeals for the Seventh Circuit, *see Burns v. Reed*, 894 F.2d 949 (7th Cir.1990), ruled that the prosecutor enjoyed absolute immunity from suit. The Supreme Court granted *certiorari* because "the Courts of Appeals are divided regarding the scope of absolute prosecutorial immunity." 500 U.S. at 483, 111 S.Ct. at 1937–38.

The Supreme Court began its analysis by squarely allocating the burden of persuasion to the prosecutor to show entitlement to immunity, function by function:

> These decisions have also emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.

500 U.S. at 486, 111 S.Ct. at 1939. Absolute immunity, even for a prosecutor, is the exception rather than the rule:

> The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been "quite sparing" in our recognition of absolute immunity, and have refused to extend it any "further than its justification would warrant."

500 U.S. at 486–87, 111 S.Ct. at 1939 (citation omitted).

The Supreme Court then drew a distinction between the prosecutorial act of advising the police and the prosecutorial act of presenting a case before a warrant-issuing magistrate. Even though the prosecutor was charged with having withheld vital information from the magistrate, his appearance at that probable cause hearing nonetheless enjoyed absolute immunity:

> The prosecutor's actions at issue here—appearing before a judge and presenting evidence in support of a motion for a search warrant—clearly involve *the prosecutor's "role as advocate for the State,"* rather than his role as "administrator or investigative officer," the protection for which we reserved judgment in *Imbler.* Moreover, since the issuance of a search warrant is unquestionably a judicial act, *appear-*

*ing at a probable-cause hearing is "intimately associated with the judicial phase of the criminal process."*

500 U.S. at 491–92, 111 S.Ct. at 1942 (citations omitted; emphasis supplied).

By contrast, the Supreme Court held that the prosecutor was only entitled to qualified immunity for his acts in advising the police during the investigative phase:

> We do not believe, however, that advising the police in the investigative phase of a criminal case is so "intimately associated with the judicial phase of the criminal process," that it qualifies for absolute immunity.

500 U.S. at 493, 111 S.Ct. at 1943 (citation omitted). Even though the investigation of the case bears a necessary cause-and-effect relationship to the later judicial phase of the case, that is not enough to entitle the investigative function to absolute immunity:

> Absolute immunity is designed to free the *judicial process* from the harassment and intimidation associated with litigation. That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, *not for every litigation-inducing conduct.*

500 U.S. at 494, 111 S.Ct. at 1943 (citation omitted; emphasis in original; emphasis supplied).

In holding that the investigative function was only entitled to qualified immunity, the Supreme Court pointed out how, even in the years since *Imbler v. Pachtman,* the defense of qualified immunity has been transformed into one that affords as full a protection to the prosecutor as society would wish to bestow:

> [T]he qualified immunity standard is today more protective of officials than it was at the time that *Imbler* was decided.[8] "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."

[8] In *Harlow v. Fitzgerald* (1982), we "completely reformulated qualified immunity," replacing the common-law subjective standard with an

objective standard that allows liability only where the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." This change was "specifically designed to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment,' and we believe it sufficiently serves this goal." Accordingly, it satisfies one of the principal concerns underlying our recognition of absolute immunity.

500 U.S. at 494–95, 111 S.Ct. at 1944 (citations omitted).

When a prosecutor is involved in the investigative function, he is entitled to no more by way of immunity than is the police officer who is involved in that same function:

> Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. Ironically, it would mean that the police, who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not.

500 U.S. at 495, 111 S.Ct. at 1944 (citations omitted).

Significantly, for present purposes, the Supreme Court held that, even though it may be claimed that the prosecutor's investigative activities are intimately involved with the judicial function of "screening cases for prosecution," that does not transmute the prosecutor's investigative function into one that is entitled to absolute immunity:

> The United States argues that giving legal advice is related to a prosecutor's roles in screening cases for prosecution and in safeguarding the fairness of the criminal judicial process. That argument, however, proves too much. *Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive.*

500 U.S. at 495, 111 S.Ct. at 1944 (citation omitted; emphasis supplied).

## C. *Buckley v. Fitzsimmons*

*Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), followed two years later. Whereas *Burns v. Reed* involved the prosecutor's giving of advice to the police during the investigative phase, *Buckley v. Fitzsimmons* involved the prosecutors' direct participation in the investigation.

The suit was brought against two successive elected prosecutors and two deputy prosecutors. Steven Buckley, as a result of the actions of the prosecutors, had been indicted, jailed, and tried for rape and murder. Having failed initially to develop sufficient evidence to obtain a warrant for Buckley's arrest, the prosecutors convened a special grand jury for the sole purpose of investigating the case. After hearing over 100 witnesses over the course of eight months, the grand jury, in January of 1984, was unable to return an indictment. Without additional evidence being presented to it, however, it subsequently did return an indictment in March of that year. Buckley was arrested and spent ten months in jail. The first jury to try him failed to reach a verdict and a mistrial was declared. After he spent two more years in jail, a State's expert witness died and all charges against Buckley were dropped. 509 U.S. at 261–64, 113 S.Ct. at 2609–11, 125 L.Ed.2d at 219–20.

Buckley brought a § 1983 action against the prosecutors, alleging 1) the fabrication of evidence during the preliminary investigation, and 2) the making of false statements at a press conference. With respect to the charge of fabricating evidence, the District Court ruled that the prosecutors enjoyed absolute immunity. The Court of Appeals for the Seventh Circuit affirmed that ruling. 952 F.2d 965 (7th Cir.1992).

With respect to the claim that an elected prosecutor allegedly made false statements at a press conference, the Supreme Court had no difficulty in concluding that the conducting of the press conference was not a prosecutorial function that was entitled to absolute immunity:

Comments to the media have no functional tie to the judicial process just because they are made by a prosecutor. At the press conference, Fitzsimmons did not act in " 'his role as advocate for the State.' " *The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions.* Statements to the press may be an integral part of a prosecutor's job, and they may serve a vital public function. But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and, qualified immunity is the norm for them.

509 U.S. at 277–78, 113 S.Ct. at 2618, 125 L.Ed.2d at 229 (citations omitted; emphasis supplied).

The nature of the immunity available to prosecutors when charged with fabricating evidence during a preliminary investigation was a closer question. On that charge, the District Court and the Circuit Court had granted the prosecutors absolute immunity. The claim related to a boot print left on the door of the victim's home when the murderer kicked in the door. Three separate studies by experts from three law enforcement agencies had all been unable to make a reliable connection between the boot print and a pair of boots owned by Buckley. During the early stages of the investigation, however, the prosecutors obtained a "positive identification" from an anthropologist in North Carolina who was allegedly well known for her willingness to fabricate unreliable expert testimony. 509 U.S. at 261–62, 113 S.Ct. at 2609–10, 125 L.Ed.2d at 219.

We first address petitioner's argument that the prosecutors are not entitled to absolute immunity for the claim that they conspired to manufacture false evidence that would link his boot with the bootprint the murderer left on the front door. To obtain this false evidence, petitioner submits, the prosecutors shopped for experts until they found one who would provide the opinion they sought. At the time of this witness shopping the assistant prosecutors were working hand in hand with the sheriff's detectives under the

joint supervision of the sheriff and state's attorney Fitzsimmons.

509 U.S. at 272, 113 S.Ct. at 2615, 125 L.Ed.2d at 225–26.

The Supreme Court recognized that the prosecutor's judicial function is not confined to his time in the courtroom alone but also involves the interviewing and preparing of witnesses for trial. That would even include "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings ... which occur in the course of his role as an advocate for the State." *Id.* at 273, 113 S.Ct. at 2615–16, 125 L.Ed.2d at 226. That, however, is significantly different from similar acts undertaken while still investigating the case:

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

509 U.S. at 273, 113 S.Ct. at 2616, 125 L.Ed.2d at 226.

Even as in the case now before us, the timing of the prosecutor's participation is a vitally important factor in determining whether his participation is judicial or investigative in character:

> The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period. Their mission at that time was entirely investigative in character. A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.

509 U.S. at 274, 113 S.Ct. at 2616, 125 L.Ed.2d at 227 (footnote omitted). The alleged fabrication of false evidence occurred prior to the filing of an indictment. The grand jury itself, when first convened, was, moreover, still conducting an inves-

tigation and not simply deciding whether to return an indictment:

> It was well after the alleged fabrication of false evidence concerning the bootprint that a special grand jury was impaneled. And when it finally was convened, its immediate purpose was to conduct a more thorough investigation of the crime—not to return an indictment against a suspect whom there was already probable cause to arrest.

*Id.*

The Supreme Court concluded that "the prosecutors' conduct occurred well before they could properly claim to be acting as advocates." *Id.* It made it clear that a subsequent indictment by a grand jury would not retroactively transform an investigative function into a judicial function:

> That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial. *A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because,* after a suspect is eventually arrested, indicted, and tried, *that work may be retrospectively described as "preparation" for a possible trial;* every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

509 U.S. at 275–76, 113 S.Ct. at 2617, 125 L.Ed.2d at 228 (footnote omitted; emphasis supplied).

### *According to the Allegations in this Case, What Prosecutorial Function Was Involved?*

■ As we apply that extensive body of law to the pleadings in this case, it behooves us to keep in the forefront of the mind the allocation of the burden of proof on the issue of absolute immunity. It was well expressed in *Harlow v. Fitz-*

*gerald,* 457 U.S. 800, 812–13, 102 S.Ct. 2727, 2735, 73 L.Ed.2d 396 (1982):

> *Butz* [*v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) ] also identifies the location of the burden of proof. The burden of justifying absolute immunity rests on the official asserting the claim.... He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted. (Citations and footnote omitted).

If all of the actions alleged against the appellants, Simms and Kodeck, unequivocally fall into the category of their judicial function as prosecutors, their Motion to Dismiss on the ground of absolute prosecutorial immunity should have been granted. If, on the other hand, all of the actions alleged against them *EITHER* 1) fall into the category of their investigative function as prosecutors *OR* 2) it is impossible to tell, without the benefit of more evidence, into which category their alleged actions fall, then their Motion to Dismiss on the ground of absolute prosecutorial immunity was properly denied.

It is clear that the Motion to Dismiss was properly denied. The allegations are that the Mayor was affronted by the raid on Taney Road on July 17, 1991 and "retaliated" against the three plaintiffs in this case by "enlist[ing] the assistance of" the State's Attorney and the Assistant State's Attorney who are the appellants here. It was alleged that the two prosecutors "manipulated evidence and, in effect, falsified evidence" against the three plaintiffs so as "to ensure that an indictment against them would be forthcoming." It is a reasonable inference that the alleged activity started shortly after July 17, 1991. The indictment against Officer Constantine, however, was not handed down until November 1, three-and-a-half months later. It is a fair inference that whatever investigation was undertaken to bring about the perjury charge against him occurred over the course of those three-and-a-half months.

██ We have no idea when it was that that indictment ultimately came to trial. We only have the allegation that that charge was ultimately "dismissed as being legally insufficient and otherwise baseless." We know that the dismissal was not until after February 14, 1992. In no sense can any investigative activity undertaken by the appellants Simms and Kodeck or any legal advice given by them to the police commissioner, to the Mayor, or to anyone else be deemed to be a part of the judicial function of the State's Attorney's Office.

What is desperately needed in this case is evidence, or at least pretrial discovery, to determine who did what and when. The allegation is that the indictments were brought and prepared by the foursome of 1) the Mayor, 2) the Police Commissioner, 3) the State's Attorney, and 4) an Assistant State's Attorney. Someone presented this case to the grand jury on or before November 1. Presumably, that was one of the two representatives of the State's Attorney's Office. Someone had to pull the file of the application for the July 17 search warrant and go over it with a fine-tooth comb to determine wherein lay the possible perjury. Someone had to make a legal assessment as to whether perjury occurred, to wit, that there was a sworn statement that was both 1) false and 2) material.

It is what happened, however, during the three-and-a-half month period between November 1, 1991 and February 14, 1992, that gives rise to the reasonable inference of a massive investigative effort. Only Officer Constantine was an affiant on the Taney Road warrant and the perjury charge as of November 1 with respect to that warrant was only as to him. Within the next three-and-a-half months, however, an additional perjury charge involving some other warrant application was made against Officer Constantine. Another charge on yet some other warrant application was made against Officer Wade. Two other charges of perjury, involving yet two other warrant applications, were brought against Officer Mohr. It is reasonable to assume that these four additional charges of February 14, none of them involving the Taney Road warrant, were the product of a massive investigation of dozens, if not

hundreds, of warrants applied for by those three officers over an extended period of time. The allegation is that the investigations were conducted by the four defendants in this case in combination with each other. The activity that led to the filing of those four additional perjury charges was quintessentially investigative in nature. As a result of the February 14 indictments, all three officers were "arrested and placed in jail."

One other allegation clearly involved actions that were not part of a prosecutor's purely judicial function. Each plaintiff alleges that at "some point during the criminal investigation and/or prosecution of them," Assistant State's Attorney Kodeck "offered to refrain from charging [them] with criminal activity or to dismiss charges already instituted against them if they were to resign" from the police department. It was also part of the allegation that the activities of all four defendants were undertaken not simply to bring criminal charges but "were also undertaken with the intent and with the desire that [the officers] resign or be pressured into resigning from the Baltimore City police force." After an allegedly high-intensity investigation, it is a reasonable inference that the Assistant State's Attorney would not have offered 1) to drop pending charges or 2) to refrain from filing additional charges without the advice and consent of his superiors.

Taking the allegations against the appellants as true, as we must at this stage of the proceedings, we are not persuaded that their alleged actions were part of the judicial function of their larger prosecutorial responsibilities. On the face of the pleadings, it cannot be concluded that they were entitled to absolute prosecutorial immunity. Judge Kahl was, therefore, not in error in refusing to grant their Motion to Dismiss the claims made against them.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.*