Dear Commissioner Hergenroeder:
You have requested our opinion concerning restrictions on membership in State-chartered credit unions, in light of a recent Supreme Court decision, National Credit Union Admin. v. FirstNat'l Bank Trust Co., 118 S. Ct. 927 (1998), that restricts membership in federally chartered credit unions. Specifically, you ask whether membership in State-chartered credit unions is limited by Maryland law to those individuals having a single common bond with all other members of the credit union. In addition, you ask whether the Commissioner of Financial Regulation has the authority to rely upon the so-called "wild card" statute to allow multiple employer groups as members in a Maryland credit union, if this breadth of membership were permissible under federal law.
Our opinion is as follows:
1. Under § 6-210 of the Financial Institutions ("FI") Article, Maryland Code, all members of a State-chartered credit union must share with all other members a single common bond.
2. If federal law allowed multiple common bonds among members of federally chartered credit unions, the Commissioner could apply the "wild card" statute, FI, § 6-208, to permit multiple common bonds among members of State-chartered credit unions. At present, however, federal law does not allow multiple common bonds. Therefore, the Commissioner may not use the "wild card" statute to allow multiple common bonds as a basis for membership in State-chartered credit unions.
 I The Supreme Court Decision
Section 109 of the Federal Credit Union Act, 48 Stat. 1219,12 U.S.C. § 1759 (the "federal Act"), provides that "[f]ederal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community or rural district." Until 1982, the National Credit Union Administration ("NCUA") and its predecessors had consistently interpreted § 109 to require that thesame common bond of occupation unite every member of an occupationally defined federal credit union.
In 1982, however, the NCUA reversed its longstanding interpretation of the federal Act and began permitting membership by multiple, unrelated employer groups. Under this revised interpretation, the common bond requirement of § 109 applied only to each employer group within a multi-group credit union, rather than to every member of the credit union. For example, under NCUA's revised interpretation of § 109, a credit union originally formed to serve the employees of one company was allowed to expand by opening its membership to employees of many other companies. Each member would have a common occupational bond with one distinct group of members but not with other groups of members.
In National Credit Union Admin. v. First Nat'l Bank TrustCo., a group of banks and their national trade association challenged the NCUA's approval of membership of certain unrelated employee groups in the ATT Family Credit Union. The banks claimed that NCUA's revised interpretation misconstrued the federal Act.
The Supreme Court agreed with the banks. It held that the common bond restriction of § 109 does not permit a federal credit union to be composed of multiple unrelated groups having distinct common bonds. When Congress enacted the federal Act in 1932, the Court found, it unambiguously expressed its intent that the same common bond of occupation must unite all members of an occupationally defined federal credit union. Because Congress itself had addressed the matter, the Court rejected the argument that the NCUA's interpretation of the federal Act should be accepted as a reasonable one:
 [W]e first ask whether Congress has "directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." . . . If we determine that Congress has not directly spoken to the precise question at issue, we then inquire whether the agency's interpretation is reasonable. . . . Because we conclude that Congress has made it clear that the same common bond of occupation must unite each member of an occupationally defined federal credit union, we hold that the NCUA's contrary interpretation is impermissible. . . .
118 S. Ct. at 938-39 (quoting Chevron U.S.A., Inc. v. NaturalResources Defense Council, Inc., 467 U.S. 837 (1984)).
 II Maryland Restrictions on Credit Union Membership
FI Title 6 governs State-chartered credit unions. Those who form a credit union are required by FI, § 6-201 to have a common bond:
 (a) In this section "organization" means any trade, profession, club, union, church congregation, parish, society, or association, or any fraternal, cooperative, or other organization.
 (b) Seven or more adult individuals, each of whom is a resident of this State and all of whom have one of the following common bonds, may act as incorporators to form a credit union under this subtitle:
(1) Similar occupations;
 (2) Membership in the same or similar organizations, professions, or associations;
(3) Employment by a common employer;
 (4) Employment within a defined business district, industrial park, or shopping center; or
 (5) Residence within an identifiable neighborhood, community, rural district, or county.
(Emphasis added.) Furthermore, under FI, § 6-210, every member of a credit union must share "with all other members" a common bond:
The members of a credit union are:
(1) Each incorporator; and
(2) Each other person who:
(i) Is elected to membership;
 (ii) Subscribes to and pays for at least one share;
(iii) Pays any entrance fee;
 (iv) Shares with all other members of the credit union one of the common bonds approved by the Commissioner and set out under the bylaws; and
 (v) Meets all of the other requirements of the bylaws.
(Emphasis added.)
The common bond restrictions of Maryland law, as they apply to both incorporation of and membership in State-chartered credit unions, are similar to the limitations imposed upon their federal counterparts by § 109 of the federal Act, as definitively construed by the Supreme Court. If there is a contrast to be drawn with the federal Act, it is that FI, § 6-201 and § 6-210 even more clearly express a legislative intent to limit membership to those sharing a single common bond.
It would be difficult to imagine statutory language that would more clearly articulate a single common bond limitation. In construing a statute, "the cardinal rule is to ascertain and carry out the real legislative intention. The primary source of legislative intent is, of course, the language of the statute itself". State v. Pagano, 341 Md. 129, 133, 669 A.2d 1339 (1996). As the Court of Appeals recently observed, "When the plain meaning of the language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end." Lewis v. State, 348 Md. 648, 653,705 A.2d 1128 (1998).
Judging from the legislative history, the "clear and unambiguous" statutory language is entirely consistent with the evident legislative purpose: to limit the membership of State-chartered credit unions by means of the common bond requirement. Prior to 1988, FI, § 6-210 did not contain the common bond requirement for members; only incorporators were required to share one common bond. In Chapter 635 of the Laws of Maryland 1988, however, the General Assembly added the membership requirement in FI, § 6-210(2)(iv). Chapter 635 was enacted following the savings and loan crisis, to facilitate the conversion of certain State-chartered mutual savings and loan associations ("SLs") to Maryland-chartered credit unions. While the legislative history offers little direct guidance on the issue, the topic of a common bond was apparently a concern, because the members of converting SLs would not all share a single common bond. Chapter 635 included a special membership provision applicable to converting SLs:
 In addition to membership authorized in § 6-210 of this title, a credit union resulting from a conversion under this subtitle may permit individuals who, at the time of conversion, are members, savings account holders, directors, officers, employees, or borrowers of a mutual association, to become members of the resulting credit union.
FI, § 9-1109.
If FI, § 6-210 did not disallow multiple common bonds among members of a State-chartered credit union, there would have been no need for the General Assembly to enact FI, § 9-1109 to accommodate members of converting SLs who would not otherwise satisfy the single common bond requirement. To read FI, § 6-210 as permitting more than a single common bond of membership would render FI, § 9-1109 superfluous, a result at odds with accepted principles of statutory construction.
Thus, in our opinion, the only acceptable reading of FI, § 6-210 is that State-chartered credit unions must be composed solely of members who share with all other members one common bond.[1]
 III The "Wild Card" Statute
FI, § 6-208, sometimes referred to as the credit union "wild card" statute, provides as follows: "Notwithstanding any other provision of this title, on approval of the Commissioner and the Credit Union Insurance Corporation, a credit union may engage in any additional credit union activity or provide any related service under the same conditions that federal law or regulation requires or permits as to federal credit unions."
The credit union "wild card" statute was originally enacted as former Article 11, Section 141A by Chapter 243 (Senate Bill 499) of the Laws of Maryland 1978. The statutory language is similar to the banking counterpart in FI, § 5-504. See generally 81Opinions of the Attorney General ______ (1996) [Opinion No. 96-032 (September 26, 1996)].
From its enactment, the credit union "wild card" law created the potential for complete parity between federal and State-chartered credit unions. In a letter dated April 3, 1978, in support of Senate Bill 499, the chairman of what was then called the Maryland Credit Union Insurance Corporation stated that "[the] principal reason for the great disparity [in numbers] between state chartered credit unions and federally chartered credit unions is the greater flexibility permitted under federal law in reference to the federally chartered credit unions." The clear import of this comment is that Senate Bill 499, which included the credit union "wild card" statute, would serve to create for State-chartered credit unions the same "flexibility" otherwise available to their federal counterparts.
Like the banking "wild card" statute, FI, § 6-208 can only be used by the Commissioner to authorize "any additional credit unionactivity or . . . related service." In our opinion, expansion of membership common bond criteria, as may be permitted by federal law or regulation, constitutes an additional activity or related service. As we previously stated in Opinion No. 96-032, the text of the statute should not be construed to defeat its underlying purpose. See, e.g., Romm v. Flax, 340 Md. 690, 688 A.2d 1 (1995). In this case, that purpose is the creation of competitive parity between State-chartered credit unions and their federally chartered counterparts. Credit unions may only offer their services to those individuals who qualify under applicable law for membership. The determination of a proper field of membership is the basic "activity" upon which their ability to offer services is established. Therefore, the ability to admit members from groups not otherwise permitted by State law would constitute an additional activity for purposes of the "wild card" statute. It follows that, notwithstanding the limitations of FI, § 6-210, the Commissioner may apply federal laws or regulations when considering the approval of multiple common bonds of membership.
The decision of the Supreme Court discussed in Part I above has clarified that, at present, § 109 of the federal Act does not permit federal credit union membership of multiple unrelated groups, each having distinct common bonds. Therefore, the Commissioner may not at present invoke FI, § 6-208 to approve State-chartered credit union membership composed of multiple common bonds. Should Congress enact pending legislation, H.R. 1151, to broaden § 109, the Commissioner may then have room to act under FI, § 6-208.[2]
 IV Conclusion
In summary, it is our opinion that all members of a State-chartered credit union must share with all other members a single common bond. FI, § 6-210 does not permit multiple common bonds of membership. While the "wild card" statute grants to the Commissioner the authority to apply to State-chartered credit unions federal laws or regulations that otherwise permit multiple common bonds of membership, federal law does not presently do so.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Thomas L. Gounaris Assistant Attorney General
_________________________ Jack Schwartz Chief Counsel Opinions Advice
[1] In carrying out the statutory scheme, the Commissioner may approve for each credit union only one of the common bonds set out in FI, § 6-201(b).
[2] FI, § 6-208 requires the additional approval of the Credit Union Insurance Corporation. This additional approval presumably is only required with respect to credit unions that hold deposits insured by the Corporation.
 *Page 92